375 So.2d 1354 (1979)
STATE of Louisiana, Respondent,
v.
Paul KEY, Relator.
No. 63717.
Supreme Court of Louisiana.
October 8, 1979.
*1355 Giles J. Duplechin, Gretna, for relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Abbott J. Reeves, Harry Hardin, Asst. Dist. Attys., for respondent.
TATE, Justice.
The defendant is charged with possession of cocaine. La.R.S. 40:967. The cocaine was found in the rolled-up sleeve of the defendant's shirt, as the result of a warrantless airport search.
We granted certiorari, 366 So.2d 914, to review the trial court's denial of the accused's motion to suppress this evidence as unlawfully seized. We reverse, finding that the cocaine was seized as the result of an illegal arrest and search of the defendant's person by narcotics agents. La.Const. of 1974, Art. 1, Section 5.
The state contends that the airport stop was justified by particularized information and observation of the defendant sufficient to support a reasonable suspicion that the relator was carrying illegal narcotics. The state argues that, consequently, the narcotics agents were justified in stopping the accused to question him as to his name, address, and explanation of his actions (La. C.Cr.P. art. 215.1; State v. Brown, 370 So.2d 547 (La.1979), and that his actions thereafter constituted probable cause for the arrest.
We do not find merit in the state's contentions.
The narcotics officers stopped the defendant at the New Orleans airport. They did so essentially on the basis that he was nervous and evasive in his movements around the airport after he had arrived on a flight from Los Angeles, that an airlines employee had noticed that he appeared at the Los Angeles ticket counter in a hurry and nervously paid his fare in small bills, and that in 1977 he had been arrested at the Atlanta Airport for possession of heroin.
The officers detained the accused in the airport restroom after he had jogged to it to use the urinal. The testifying agent admitted that this conduct was consistent with the actions of a man in a hurry to use the bathroom; however, he felt it to be consistent with an intent to dispose of illegal narcotics by flushing them down the drain.
The officers had no information upon which to base a reasonable belief that the defendant was engaged in illegal activity at the time they stopped him. A mere suspicion arising from his prior arrest did not entitle the officers to believe that the accused was presently engaged in any illegal activity. The remaining conduct of the defendant was just as consistent with innocent as with illicit behavior. It did not provide the specific and articulable facts indicating criminal conduct sufficient to justify the instant investigatory stop. State v. Matthews, 366 So.2d 1348 (La. 1978); State v. Washington, 364 So.2d 958 (La.1978).
For this reason alonelet alone because of the illegal arrest, the coerced consent to an initial unsuccessful) search, and the involuntariness *1356 of the subsequent search of the defendant's shirtsleeve, the evidence seized as a result of the illegal stop should have been suppressed.

Decree
Accordingly, we reverse the action of the trial court in denying the defendant's motion to suppress the evidence illegally seized, and we enter judgment sustaining this motion. We remand this case for further proceedings in accordance with law.
REVERSED AND REMANDED.
SUMMERS, C. J., dissents and files reasons.
MARCUS, J., dissents.
BLANCHE, J., dissents for reasons assigned by SUMMERS, C. J.
SUMMERS, Chief Justice (dissents and files separate opinion).
Two bills of information charged defendant Paul Key with possession of heroin, a violation of Section 966, and possession of cocaine, a controlled dangerous drug, a violation of Section 967, both sections of Title 40 of the Revised Statutes. Motions to suppress the heroin and cocaine as evidence were filed on behalf of defendant Key alleging that the drugs were obtained as a result of an unlawful search without a valid warrant, in violation of defendant's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of Louisiana.
After a hearing on the motions to suppress they were denied by the trial judge. Defendant applied to this Court for review, and certiorari was granted.
At the hearing Special Agent Raymond Egan of the Drug Enforcement Administration testified. He was an experienced officer having served with the Drug Enforcement Administration for more than nine years. His duties were to enforce the narcotic laws. In that capacity he routinely maintained surveillance of planes arriving from Los Angeles. On August 11, 1978 he was detailed at the New Orleans International Airport. About five o'clock that afternoon he received a phone call from Sergeant Jack Scully of the Los Angeles Police Department, Airport Detail. Sergeant Scully informed Agent Egan that he had been contacted by a National Airlines employee who had noticed "some erratic behavior" on the part of Paul Key, a passenger. Key, according to the information, had arrived at the ticket counter in a hurry just prior to departure of the New Orleans flight. He appeared to be very nervous and paid for his ticket in small bills. With this information Agent Egan notified his partner, Agent Schwab of the Jefferson Parish Sheriff's Office, and they met the flight when it arrived in New Orleans about 7:30 that night.
Egan positioned himself at the exit ramp while Schwab waited at a distance on the concourse. They had been furnished with a height and weight description of Key, a Negro male. In addition Agent Egan had obtained a print out from the narcotic computer indicating that Key had been arrested in October of 1977 at the Atlanta Airport with a pound of heroin.
As the passengers debarked from the plane three Negro males, fitting the general description of Key, were among them. Egan followed these three men down the concourse. As they proceeded toward the baggage area Key turned around, saw Egan and hurriedly faced ahead again and walked very fast, passing the other passengers. Halfway along the concourse Key turned around again to look at Egan, and continued his hurried walk along the concourse. Egan decided then that on the basis of his experience in these cases, Key was the man to follow.
When he left the concourse Key walked past the stairway leading down to the baggage area and ducked quickly into a book store to the right. Egan walked past the book store to the elevator and descended to the ground floor. Schwab, who was following, noticed that Key, from his vantage point in the book store, was watching Egan as Egan went by the book store.
*1357 Key then left the book store and walked down the stairway to the baggage area where, seeing Egan again, he walked past the baggage area and then outside through the door leading to the parking area. Once there he looked back and re-entered the door. For the second time he walked past the baggage area to the stairway he had descended from the concourse. After walking up two steps he stopped, turned around and returned to the National Airline baggage area, passed it and proceeded to the adjoining Southern Airline baggage area, then to the doorway to the parking area the second time. Without going through the door he stopped, looked around and returned past the National Airline baggage area for the fourth time on his way up the stairway and into the book store.
Seeing these maneuvers by Key, Egan and Schwab followed him and arrived upstairs in time to see him enter the book store at its eastern entrance, while looking over his shoulder. When he saw Egan following he "broke out of the eastern end of the book store in a jog and ran towards the men's room." Apprehensive that Key would flush whatever narcotic he was carrying down the toilet, Egan and Schwab caught up with him just as he entered the men's room.
They identified themselves, displaying their identification cards. Key paid little attention, saying "Man I got to go to the bathroom. Here search this.", and he handed them a shaving kit, and turned to the urinals. When he had finished he asked them why they were "hassaling" him and what they wanted. Egan answered that he suspected him of carrying narcotics.
At this Key exclaimed, "I know what this is all about." and snatched the shaving kit from Egan's hands, saying, "You ain't going to search nobody. You are not going to search nothing. I am going."
He then "broke through" between Egan and Schwab and was grabbed by Egan as he attempted to leave. He was told he was going to accompany the officers to the airport office in order that they might apply for a search warrant to let the judge decide whether he could be searched. Key was belligerent, stating that he knew the procedure and that the officers were violating his rights and had no right to search "anybody or anything."
When they arrived at the office, while Schwab was assembling the forms to prepare an application for a search warrant, Key said, "Look, I know what you all are looking for. I don't have anything. If I let you search me, will you let me go?"
Egan replied, "If you don't have anything and you consent to a search, we would have to let you go."
"Fine," Key said, and he opened his shirt, pulled his shirt out of his pants, pulled everything out of his pockets and threw the contents on the table. He also threw the shaving kit on the table, with this remark:
"Here man, search me. Let me get this over with."
The officers patted him down and found no prohibited substances.
As Key was returning his belongings to his pockets, Schwab noticed a bulge in his rolled-up shirt sleeve and asked Key what it was. Key again sought to break away from detention but was deterred. Further search disclosed cocaine and heroin in small packages in the rolled-up part of Key's shirt sleeve. After these were seized, Key offered the officers the three hundred dollars he had at the time, saying he knew they were not interested in such small quantities of heroin or cocaine and he wished they would take the money and let him go. He was then advised of his rights, arrested and booked. No defense witnesses testified and no defense evidence contradicts the State's version of the facts. Only fifteen minutes elapsed from Key's arrival to his arrest.
In his first assignment of error defendant asserts the trial judge erred in denying defendant's motion to suppress evidence on the grounds that the initial investigating stop was illegal.
Section 5 of Article I of the Louisiana Constitution, like the Fourth Amendment to the United States Constitution, prohibits *1358 unreasonable searches and seizures. Both Constitutions either expressly or by implication recognize a citizen's right to privacy. It has been decided, however, that these rights are not violated by a law enforcement authority when he temporarily detains a person whom he suspects is committing, has committed, or is about to commit a crime. The principle is recognized in Article 215.1 of Louisiana's Code of Criminal Procedure in these words:
"A. A law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or a misdemeanor and may demand of him his name, address and an explanation of his actions.
"B. When a law enforcement officer has stopped a person for questioning pursuant to this Article, and reasonably suspects that he is in danger of life or limb, he may search the outer clothing of such person for a dangerous weapon or for any other thing the possession of which may constitute a crime.
"C. If the law enforcement officer finds a dangerous weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."
Further approval of the principle is to be found in the holding of the United States Supreme Court in United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), where, elaborating on its decisions in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court said:
"These cases together establish that in appropriate circumstances the Fourth Amendment allows a properly limited `search' or `seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime. . . ."
In Williams the Court stated the rule thus:
"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary Terry recognizes that it may be the essence of good police work to adopt an intermediate response . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."
See also State v. Robinson, 342 So.2d 183 (La.1977); State v. Perique, 340 So.2d 1369 (La.1976).
In order for a detaining officer to justify a stop of an individual he must have articulable knowledge of particular facts sufficient to reasonably cause the detaining officer to suspect the detainee of past, present or imminent criminal conduct. United States v. Dewberry, 425 F.Supp. 1336 (E.D. Mich.1977); La.Code Crim.Pro. art. 215.1; State v. Taylor, 363 So.2d 699 (La.1978). State v. Perique, supra. Determination of these factors which justify a stop are made on a case by case basis. United States v. Klein, 592 F.2d 909 (5th Cir. 1979) is a case on point in many respects similar factually to the case at bar. See also United States v. Himmelwright, 551 F.2d 991 (5th Cir. 1977); United States v. Allen, 421 F.Supp. 1372 (E.D.Mich.1976); United States v. Van Lewis, 409 F.Supp. 535 (E.D.Mich.1976).
The modern airport setting presents a barrage of law enforcement problemshijacking, illicit drug traffic, bomb threats. In response to airplane hijackings in the late 1960's, airlines were required to use an FAA profile test to help screen out potential hijackers. The profile is a list of characteristics based on scientific, sociological and psychological data to help identify those ticket holders who are most likely to be hijackers. While the hijacker profile test has now been discarded for the magnetometer and the search of all carry-on luggage, *1359 its initial success fostered the Drug Enforcement Administration development of a "drug courier" profile test for use in major airports. "Airport Searches Continue to Cause Problems," Donald E. Wilkes, Jr., Vol. 4, No. 3, Search and Seizure Law Report (1977).
The drug courier profile is a rather loosely formulated list of characteristics used by D.E.A. agents to indicate "suspicious" persons. These characteristics include: 1) the use of small denomination currency for ticket purchases; 2) travel to and from major drug import centers, especially for short periods of time; 3) the absence of baggage or use of empty suitcases; 4) nervousness; and 5) use of an alias. "Search and Seizures Arrests and Confessions," by William E. Ringle (1978 supplement).
Because of the imminently destructible nature of drug evidence, police officers must act quickly to apprehend the suspects and seize contraband in drug cases. Warrants are rare, particularly for minor possessory offenses. Ringle, "Searches and Seizures . . . .", supra.
There were articulable facts to justify the officers in this case to stop Key and detain him for further questioning. He used small denomination currency to purchase his ticket; he was traveling from Los Angeles, a major drug import center as can be inferred from the practice of constantly maintaining a surveillance of passengers arriving by plane from that city, and as reported cases recognize; except for a small shaving kit, Key had no luggage, or refused to claim any, as the repeated by-passes of the baggage area demonstrate; he was nervous, both at the time of purchasing his tickets and when he discovered he was under surveillance by Egan as his furtive and evasive movements make evident, especially his run for the men's room when he realized he was unable to elude the following officers.
In addition, and of special significance, Egan had obtained a computer print out disclosing that Key had been arrested at the Atlanta Airport the year before with a pound of heroin. This information, together with the fulfillment of the "courier profile", provided the requisite reasonable suspicion to justify the officers in stopping Key in the men's room because they believed he possessed narcotics and a crime was being committed for that reason.
As Egan said when asked on cross-examination what reasons did he have for stopping Key when he ran to the men's room,
"Well, in my experience as a Law Enforcement Officer people that act that particular way, just the little things that he did then, the way he looked at me indicated to me that he was doing something, and the only reason to go to the bathroom to get rid of something."
The next issue is whether the officers acted properly in taking defendant from the men's room, a public area of the airport, to a private office to prepare an application for a search warrant. Such a change in the character of the detention must be based on consent or probable cause. In this case the State must rely upon probable cause. The questioning of Key in the men's room, his initial consent to the search of his shaving kit, his recognition of the fact that the officers wanted to search him for narcotics, and his withdrawal of consent to search the shaving kit, his attempt to flee from detention and his belligerent reaction when he was told he would be detained while the officers obtained a search warrant when combined with the facts and circumstances already known to the officers leading to the initial stop furnished the requisite probable cause to warrant this further detention. These facts were sufficient to lead prudent narcotic agents to believe that defendant possessed contraband drugs. U. S. v. Dewberry, supra.
After defendant was escorted to the private office, apparently being of the opinion that the officers would probably obtain a warrant to search him, Key emphatically consented to the search but sought to flee again when the officers discovered the bulge in his shirt sleeve where the cocaine and heroin were secreted.
*1360 Assuming arguendo that the prior detention were considered legally questionable, not every search made after an illegal detention is per se invalid. If a defendant consents to a search after such a detention, the search may be valid under the consent exception to the normal requirement of a warrant. State v. Angel, 356 So.2d 986 (La.1978).
A search or inspection conducted with the consent of a defendant is an exception to both the warrant and probable cause requirements of the law. And the voluntariness of the consent is a question of fact to be determined by all of the facts and circumstances of each case. In such a determination the trial judge's conclusions on credibility are entitled to great weight. State v. Tennant, 352 So.2d 629 (La.1977) and cases cited there.
Undoubtedly Agent Egan's frank and forthright testimony giving the facts favorable and unfavorable to the State's case was considered credible and persuasive by the trial judge and accounts to some extent for his ruling denying the motion to suppress. There was, moreover, no contradiction to Egan's testimony. The search and seizure were valid.