KLIEBERT, Judge.
Defendant, Charles Jackson, was arrested for the illegal possession of a controlled dangerous substance in violation of R.S. 40:967. He filed a motion to suppress evidence obtained as a result of a warrantless search of a piece of luggage in his possession. The motion to suppress was denied by the trial court. The defendant’s application for supervisory writs to this court was denied. On application to the Supreme Court, supervisory writs were granted and the case transferred to this court for argument and opinion. For the reasons which follow, we affirm the trial court’s dismissal of the motion to suppress the evidence.
The facts surrounding Jackson’s arrest and search are as follows: Two members of the Jefferson Parish Sheriff’s Office, Narcotics Division, i.e., Agents Hurley and Whitehead were routinely assigned to the New Orleans International Airport in an attempt to curb the trafficking of controlled dangerous substances via air traffic. As part of their routine observation of incoming flights, the officers observed with particularity those flights coming from “source cities”, that is, cities that experience has proven to be a distribution hub for illegal drug trafficking. In observing these flights the officers paid particular attention to those persons who fit a “drug courier profile”. The “drug courier profile” is in essence the collective and distilled experiences and observations of narcotics officers concerning characteristics observed in drug couriers.
Both deputies testified that Mr. Jackson fell under suspicion because:
1). He was arriving on a plane from Los Angeles which is considered a source city;
2). While departing the plane he stopped on several occasions to look over his shoulder;
3). He walked very slowly on the concourse and gave the appearance of being nervous;
4). He claimed only one small piece of luggage which they concluded unusual after such a long flight.
The officers initially approached Jackson after he had claimed his luggage from the baggage carousel. They identified themselves and Agent Whitehead asked Jackson if he would answer a few questions. The officers testified that Agent Whitehead asked Jackson for a driver’s license and for his plane ticket. According to their testimony, Jackson responded by saying he did not have a driver’s license and had left his ticket on the plane. Agent Whitehead then explained to Jackson that because of his similarities to the drug courier profile he was suspected of transporting illegal drugs and asked him if he would consent to a search of his luggage, which he refused. Upon this refusal, the officers informed him they would obtain a search warrant and asked if he would accompany them to their third floor narcotics office at the airport. Mr. Jackson then accompanied the officers to the office, which was a small room, about 12 x 12, containing a couple of desks, file cabinet, chairs and a sofa.
Upon their arrival in the waiting room, Agent Whitehead performed a “frisk search” of the defendant’s person for weapons. He located a white paper, hand rolled cigarette which he believed to be marijuana in defendant’s sock. Jackson was then arrested for possession of marijuana. Agent Whitehead then asked Jackson to empty his pockets, which were found to contain an additional small quantity of marijuana. He also found a Delta Airline ticket in the name of James Jackson in the defendant’s inside coat pocket. While Agent Whitehead was conducting the search of his person, the defendant asked Agent Hurley what he was doing. In response, he was told Agent Hurley was preparing a search warrant. Agent Whitehead, after informing defendant he was not required to do so, again asked if he would permit a search of his luggage. At this time, the defendant consented to the search and signed a consent to search and a rights of arrestee form. Upon searching the lug *705 gage, a large quantity of preludin was found.
The defendant’s version of the events leading to his arrest is essentially the same as that of the officers. He said he looked around the concourse because he was unfamiliar with the airport and was trying to find his way out and that he walked slowly because he was unaccustomed to the heat of New Orleans’ sub-tropic climate. He further testified as to a subjective belief he was under arrest before being taken to the upstairs narcotics office as follows:
“CAPITELLI:
Q. He told you he was going to have to take you upstair ‘cause he was going to obtain a search warrant?
A. Right.
Q. At that point, did you have any option or chance or opportunity to leave?
A. None whatsoever.
Q. Did he tell you you had the opportunity to leave?
A. No, at that point I felt that I was under arrest.”
THE INVESTIGATORY ENCOUNTER AT THE AIRPORT
The validity of airport searches on facts similar to those in the instant case have been addressed by us and then affirmed by the Louisiana Supreme Court in State v. Ossey, 446 So.2d 280 (1984). The United States Supreme Court in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) and United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) has also addressed the question. As the plurality in Royer stated, there is no:
“ ‘_litmus paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigatory stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances....’ Id. 103 S.Ct. at 1329.”
The instant case is obviously one of the endless variations of facts and circumstances that will occur in airport searches. The dispositive issues in the case appears to be whether or not the confinement went beyond the restraint upon the individual outlined in United States v. Mendenhall, supra. The State argues that the intrusion on Jackson was justified either because Jackson submitted to the entire encounter consensually and/or that there was reasonably articulable suspicion to justify the temporary encounter that did not overstep the bounds of the type approved in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and subsequently in United States v. Mendenhall, supra. Thus, we must examine the facts of this case to determine if an unconstitutional seizure and search was conducted in the light of the United States Supreme Court’s decision in the Royer and Mendenhall cases, supra, and the Louisiana Supreme Court’s decision in the Ossey case, supra.
The initial contact by the officers was based on Jackson’s actions and conduct as he left the plane. Specifically, that he was coming from a source city, he walked slowly, and he appeared to be nervous. The officers did not violate the Fourth Amendment by merely approaching Jackson in a public place and asking him if he would voluntarily answer some questions concerning possible criminal activity. Likewise, the fact that they identified themselves as police officers does not convert the encounter into an illegal seizure. State v. Ossey, supra; Florida v. Royer, supra.
We next consider whether further actions of the police officers in the encounter amounted to a detention of Jackson. The state seeks to distinguish the Royer case from the present one while the defendant argues Royer is directly in point. The decisive question becomes the voluntariness of Jackson’s consent to be detained. The answer is to be determined by reviewing the totality of the circumstances present in the case; State v. Ossey, supra; Schneckloth v. Bustamonte, 412 U.S. 218, *706 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In Royer, the plurality found Royer had not consented to the search because the officers had retained his license and plane ticket and took possession of his baggage when they “requested” he come with them.
In the instant case, Jackson did not give the officers his license or his ticket, which they could have used to coerce him. The fact that he refused to produce identification or a ticket indicates his awareness of his ability to refuse the requests of the officers to accompany them to the narcotics office. The element of non-consensual coercion present in Royer is not present here. Factually, the case is more analogous to the facts of U.S. v. Mendenhall, supra, where no luggage was involved, and the ticket and the identification were immediately returned. The objective approach to restraint adopted in Mendenhall clearly indicates Jackson knew he was free to refuse to cooperate with the officers if he so wished. Further, the factual determination of consent must be left to the discretion of the trial court unless clearly erroneous. Ossey, supra.
Although reasons of safety and security were not urged as reasons for the transfer from the baggage area to the narcotics office, the plurality in Royer, supra, 103 S.Ct. at page 1328, recognized “there are undoubtedly reasons of safety and security that would justify moving a subject from one location to another during an investigatory detention, such as, from an airport concourse to a more private area, Cf. Pa. v. Mimms, 434 U.S. 106, 109-111 [98 S.Ct. 330, 332-334, 54 L.Ed.2d 331] (1977). Undoubtedly experienced police officers have subjective reasons of safety and security in mind when transferring a subject to a more secure area during an investigatory encounter.
In our view, the officers did not act unreasonably in the investigatory encounter.
THE FRISK FOR WEAPONS
Having determined the investigatory encounter was legal, we have to determine if the “frisk for weapons” which produced the marijuana cigarette and the defendant’s arrest was a permissible search under the United States and the Louisiana Constitutions. These constitutional provisions assure the “right of the people to be secure in their persons, ...., against unreasonable searches and seizures.” U.S. Constitutional Amendments IV and XIV; Louisiana Article I, Section 5. Thus, the inquiry here is whether the “frisk for weapons” was reasonable.
The United States and Louisiana Supreme Courts have held that warrantless searches are per se unreasonable unless they are subject to well defined exceptions. U.S. v. Katz, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Terry v. Ohio, supra; State v. White, 399 So.2d 172 (La.1981); State v. Hunter, 375 So.2d 99 (La.1979).
The Terry -type cases have required that the officers have a reasonable belief a person is armed before a search for weapons is made. In the instant case, the officers testified the pat-down search was conducted because of the fear of being confined in a small room with someone who might have a weapon. Judged from the standard established by the Terry -type cases, i.e., the officer must be “able to point to particular facts from which he reasonably inferred the individual was armed and dangerous” (State v. Hunter, supra, at p. 101) the reasonableness of the search here is questionable. Yet, these courts have never applied this rule systematically without first examining the facts of the particular case. State v. Thompson, 448 So.2d 666 (La.1984).
The United States and Louisiana Supreme Courts have recognized that the protection afforded citizens by the Fourth Amendment against unreasonable seizures and searches is a delicate balance between legitimate public interest and the individual’s right to be free from unreasonable interference of police officers. State v. Thompson, supra; United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).
*707 We must recognize, as did the concurrence and dissents in the Royer case, supra, the enormous public interest the state seeks to further in conducting airport searches. Airports operate as a bottleneck in the mass distribution of controlled drugs. Drug couriers carrying drugs in large volumes operate as hubs in the mass distribution of drugs. The state, in protecting the legitimate interest of its citizens, serves the public well in attempting to stop the flow of drugs at this bottleneck. In the instant case the efforts of two officers has impounded a quantity of drugs that otherwise would have taken an army of officers months to control.
The legitimate interest of the state to control activities at airports and other points of travel has long been recognized. Limited intrusions are allowed to combat airline hijackings. U.S. v. Skipwith, 482 F.2d 1272 (5th Cir.1973). Limited stops and searches have been allowed at border crossings to combat the flow of illegal aliens. U.S. v. Brignoni-Ponce, supra; Limited searches to enforce agricultural quarantines. State v. Schafer, 461 F.2d 856 (9th Cir.1972). Likewise, there has been a recognition of a “vital national interest in preventing illegal entry and smuggling, particularly narcotics”. W. LaFave, Search and Seizure, A Treatise of the Fourth Amendment, § 10.5 at z79.
The court in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967) went on to state:
that there is no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails. But we think that a number of persuasive factors combine to support the reasonableness of area code-enforcement inspections. First, such programs have a long history of judicial and public acceptance. * * * Second, the public interest demands that all dangerous conditions be prevented or abated, yet it is doubtful that any other canvassing technique would achieve acceptable results. * * * Finally, because the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of the urban citizen’s privacy.
Thus, viewed in the totality of the circumstances, the situation involved here is not an investigatory stop by patrolling police officers followed by a search at a street corner which raises a confrontation between the individual’s right to personal security and an arbitrary interference by the government. Rather, it is a confrontation between the state’s legitimate interest in the control of the mass distribution of drugs by commercial airline and the limited intrusion into the privacy of an individual who has continuously aroused the suspicions of the police officers as the investigatory events developed. Under such circumstances the reasonableness of the pat-down search should not turn solely on whether the officers noticed a bulge in the defendant’s coat or a sound leading him to believe there was a possibility of a weapon or some other physical evidence which led him to believe there was a possibility the defendant was armed as would be required in a confirmation between the individual’s right to personal security and the arbitrary interference of a police officer at the street corner. Rather, the standard applied in those cases where the government has a legitimate and vital interest in the protection of its people from airline hijacking or the protection of its borders should be applied.
In State v. Thompson, supra, Justice Blanche said:
“The ‘public interest’ involves the societal costs incurred due to the exclusion of evidence seized in violation of the Fourth Amendment. Such evidence usually forms the basis of the case against the accused because it is factual, tangible evidence of the most reliable nature. Its exclusion results in a harm to society by interfering with the truthseeking function of a criminal trial. Society must absorb the cost of the exclusion’s result — that a violent criminal is returned to freedom within society. Thus, there is *708 a public interest in bringing the criminal element of our society to justice.
The intrustion into the ‘sanctity of a man’s home and the privacies of life’, Boyd v. United States, [116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886)], supra, must be balanced with the public interest in bringing criminals to justice and with the societal costs involved in releasing a criminal back into society in determining whether a search is ‘unreasonable’. This balancing must be made by an examination of the totality of the circumstances surrounding the alleged illegal search to determine whether that search was ‘unreasonable’ under the Fourth Amendment. cf. United States v. Brignoni-Ponce, supra; Terry v. Ohio, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968); Camara v. Municipal Court, 387 U.S. 523 [87 S.Ct. 1727, 18 L.Ed.2d 930] (.1967). Common sense dictates that reasonableness varies with the circumstances of the search. Preston v. United States, 376 U.S. 364 [84 S.Ct. 881, 11 L.Ed.2d 777] (1964). Whether a particular search is unreasonable is something to be determined by the facts of a given case. Schmerber v. California, 384 U.S. 757 [86 S.Ct. 1826, 16 L.Ed.2d 908] (1966); see also Justice Black’s dissent in Vale v. Louisiana, 399 U.S. 30, 36 [90 S.Ct. 1969, 1973, 26 L.Ed.2d 409] (1970).”
In balancing the state’s vital interest of controlling the flow of contraband at bottleneck areas, such as airports, against the individual passenger’s freedom from unreasonable governmental interference, can only lead to the conclusion that the Terry v. Ohio, supra, standard for determining the reasonableness of a search must be relaxed in this limited setting. The officers here had accumulated suspicions tantamount to the “reasonable suspicion” required to conduct a strip search at a border search. United States v. Olcott, 568 F.2d 1173 (5th Cir.1978); United States v. Asbury, 586 F.2d 973 (2nd Cir.1978). The same interest to be protected and exigent that exists in border searches are present here. Much like the recognition by LaFave that the state has a vital interest in protecting against smuggling of drugs and that “The Mexican-American border is the scene of wholesale drug trade”, we recognize that large volumes of illegal drugs flow from “source cities” (in this instance Los Angeles) to metropolitan areas throughout the United States (in this case New Orleans). This recognition is advocated by the separate opinion of Justices Powell and Blackmun in the Royer case.
The limited searches of suspected persons at airports in order to combat the flow of illicit drugs is, as we have previously discussed, effective and as stated in the Camara case, supra, “No other canvassing technique would achieve acceptable results”. Also, the technique employed here involved the least amount of interference with the public as a whole, and the individual who is searched suffers a limited invasion considering the limited expectation of privacy associated with public air transportation.
We recognize that the limited exception to probable cause created by the Terry case was justified by the concern over the reasonable safety of investigating officers and should not be extended beyond that except on particular facts. Here, the exigencies surrounding airport searches to control the flow of illicit drugs compels a less of the strict application of the Terry exceptions and its progeny. Like Justice Powell’s concurrence in Royer, we must recognize that flights in domestic service and the officers attempting to police the flow of illegal drugs merit special consideration. In 103 S.Ct. at page 1329 in the Royer case he said:
“I join the plurality opinion. This is an airport ‘stop for questioning’ case similar in its general setting to that before us in United States v. Mendenhall, 446 U.S. 544 [100 S.Ct. 1870, 64 L.Ed.2d 497] (1980). The plurality opinion today has discussed helpfully the principles applicable to investigative stops for questioning. Since I was the author of one of the opinions in Mendenhall, id., at 560 [100 S.Ct. at 1880], I write briefly to repeat that the public has a compelling interest *709 in identifying by all lawful means those who traffic in illicit drugs for personal profit. As the plurality opinion emphasizes, ante, at- [103 S.Ct. at 1329], the facts and circumstances of investigative stops necessarily vary. In view of the extent to which air transportation is used in the drug traffic, the fact that the stop at issue is made by trained officers in an airport warrants special consideration.”
We cannot say that the limited intrusion of the investigatory stop or of the pat-down search and the subsequent discovery of the marijuana or the consensual search of the defendant’s baggage were unreasonable in light of the interest to be balanced in conducting a search which the plurality in Royer described: “that discrete category of airport encounters”. Accordingly, the trial court’s denial of the motion to suppress is affirmed.
AFFIRMED.