457 So.2d 660 (1984)
STATE of Louisiana
v.
Charles JACKSON.
No. 84-KK-1050.
Supreme Court of Louisiana.
October 15, 1984.
*661 Ralph Capitelli, Capitelli, Bencomo & Wicker, New Orleans, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., James Maxwell, Dorothy A. Pendergast, Asst. Dist. Attys., for plaintiff-respondent.
BLANCHE, Justice.
Charles Jackson was charged by bill of information with the illegal possession of preludin in violation of La.R.S. 40:967. Prior to the trial, the defendant filed a motion to suppress physical evidence. The trial court denied that motion and the 5th Circuit Court of Appeal denied the defendant's application for writs. Upon the defendant's application to this court, the writ was granted and the case was remanded to the court of appeal for consideration in light of State v. Ossey, 446 So.2d 280, 281 (La.1984) with the suggestion that Ossey might be distinguishable. 445 So.2d 455. On remand, the Louisiana 5th Circuit Court of Appeal affirmed the trial court's denial of the motion to suppress. 452 So.2d 703. Upon defendant's application, this court granted writs to review the correctness of the lower court's ruling. 453 So.2d 946.
On June 6, 1983, Charles Jackson arrived at the New Orleans International Airport on a flight from Los Angeles, California, a source city for drug transportation. Agent Whitehead and Agent Hurley[1] of the Jefferson Parish Sheriff's Office were conducting routine surveillance of that flight. These officers are plain clothes narcotics agents whose main purpose is to detect and apprehend drug couriers using a profile which is an abstract of characteristics found typical of persons transporting drugs.[2] The officers observed the defendant disembark from the plane and noticed that he was walking in an unusually slow manner down the concourse, while occasionally glancing over his shoulder. These actions, together with the fact that he was arriving from a source city, were consistent with characteristics of the drug courier profile causing the officers to suspect the defendant was transporting drugs.
The agents placed the defendant under surveillance and followed him down the concourse to the baggage claim area where the defendant retrieved one small, maroonish, mesh-type suitcase. Testimony reveals that another established characteristic of the drug courier profile is a small amount of luggage for a long distance trip. Immediately after Jackson exited the airport, Agent Whitehead and Agent Hurley approached Jackson and showed him their police identification. After asking if they could speak to the defendant, Agent Whitehead testified that Jackson responded, "Yeah, I don't mind speaking. What you want?" The officer asked for some identification and the defendant's ticket. Jackson stated that he did not have any identification and had left his ticket on the plane, but told the officers his name was Charles Jackson. The agents then informed the *662 defendant that they believed he was transporting drugs and asked if they could search his suitcase. Jackson flatly refused to permit the search. Agent Hurley testified that at that point, "... we advised him that we were going to obtain a search warrant for the bag and that, until we could identify him, we asked him to accompany us to our upstairs office at the airport." (sic) Tr. p. 8.
Upon arriving in the office, Agent Whitehead frisked Jackson for weapons and found a handrolled cigarette in his sock. The defendant was immediately placed under arrest and advised of his rights. More marijuana was found in his coat pocket. While Jackson was emptying his pockets, Agent Hurley began typing a search warrant for the suitcase and informed the defendant of that fact. Whitehead then asked Jackson if he would consent to the search of the suitcase. At this point, Jackson told him to "go ahead". A written consent form was prepared and Jackson signed the form. The search of the suitcase revealed 32 clear bags that contained 100 preludins each.
Jackson contends that the trial judge erred in denying his motion to suppress drugs seized during the incident at the New Orleans airport. Jackson argues that he was being detained illegally and the evidence obtained as a result of the illegal searches is inadmissible.
The validity of an airport search on facts similar to those in the instant case has been addressed by this court in State v. Ossey, supra, and by the U.S. Supreme Court in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); U.S. v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In Ossey, two police officers observed Ossey at the New Orleans International Airport after he disembarked from a plane from Los Angeles. Because Ossey's appearance, luggage and actions fit the drug courier profile, the officers approached Ossey, identified themselves as policemen and asked if they could speak to him. Ossey produced a driver's license and ticket that showed that he was traveling under an alias. The officers asked to search Ossey's suitcase. Ossey responded by asking if officers had a search warrant. The officers asked Ossey to accompany them to their office while one was prepared and Ossey agreed to go with them. The trial judge found that the defendant voluntarily accompanied the agents in a spirit of apparent cooperation and freely consented to the search of his suitcase. This finding was given great weight on appellate review. Since Ossey voluntarily accompanied the officers, he was not being illegally detained when he consented to the search, the resulting seizure of the drugs was permissible.
In U.S. v. Mendenhall, supra, two DEA agents approached the defendant after determining she met several of the characteristics of the drug courier profile. Mendenhall's driver's license and ticket showed she was traveling under an alias. After returning her driver's license and ticket, the agents asked her to accompany them to the DEA office for further questioning. As in Ossey, the trial judge found that Mendenhall accompanied the agents to the office voluntarily in a spirit of apparent cooperation and that she freely consented to the search that revealed she was transporting drugs. The U.S. Supreme Court upheld this finding and stated that since there was no illegal detention when Mendenhall consented to the search, the seizure of the drugs was permissible.
The present case differs factually from State v. Ossey and U.S. v. Mendenhall because there was no finding that the defendant voluntarily went with the agents by the trial court. In fact, in the instant case, the trial judge indicated he questioned the legality of the detention because in admitting the evidence seized in the search, he created a "good faith" exception to the exclusionary rule.[3]
*663 In Royer, unlike Ossey or Mendenhall, the Court held that the drugs discovered in an airport search should be suppressed. Royer's appearance, luggage and actions fit the drug courier profile and aroused the suspicions of two plain clothes detectives. Royer bought a one-way ticket to New York and checked two bags. The detectives approached him and identified themselves and asked if Royer would speak to them. Upon request, Royer produced a driver's license and ticket that showed he was traveling under an alias. The detectives informed him that they were conducting a narcotics investigation and they suspected him of transporting drugs. The detectives asked Royer to accompany him to their office. The officers, without Royer's consent, retrieved Royer's luggage. When asked if he would consent to the search of his luggage, Royer produced a key that unlocked one of the suitcases. Marijuana was found in both bags.
The Court determined that the initial encounter with the detectives was a permissible consensual encounter. Royer was "seized" when he was told he was the focus of a drug investigation and was asked to accompany them to another room. The court found that there were reasonable grounds to justify a temporary Terry-type detention; however, the court went on to find that the limits of a permissible temporary detention had been exceeded. The consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room and as a practical matter, Royer was under arrest. The officers' actions of compelling Royer to follow them and then subjecting him to interrogation in a small private room exceeded the scope of a permissible investigatory detention. Since Royer was illegally detained when he consented to the search of his luggage, the consent was tainted by the illegality and was ineffective to justify the search. Florida v. Royer, supra, is analogous to the present case. As in Royer, the issue in the instant case is whether Jackson was being illegally detained at the time the evidence he seeks to suppress was discovered. The initial encounter between the officers and Jackson outside the airport was not a "seizure" for purposes of the 4th Amendment. Jackson agreed to cooperate with the officers instead of walking away from them.[4] However, when the officers asked to see Jackson's identification and ticket, he could not or did not produce either. The officers then asked if they could search his suitcase and Jackson flatly refused to permit the search. Jackson then was told he was the focus of a drug investigation. He was to accompany the officers upstairs so he could be identified and so a search warrant could be obtained for the suitcase.[5] As in Royer, when Jackson was relocated to the police office for further questioning, the detention to which he was subjected exceeded the scope of a permissible investigatory stop. Like Royer, "[w]hat had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room." Florida v. Royer, 460 U.S. at 503, 103 S.Ct. at 1327, 75 L.Ed.2d at 240 (1983). Jackson's detention in an upstairs office for further investigation and interrogation was no longer the brief intrusion on Jackson's liberty permitted by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d *664 889 (1968), and its progeny. The incident had become a custodial interrogation and as a practical matter, Jackson, like the defendant in Royer, was under arrest. Jackson did not voluntarily consent to the relocation and was not free to go. Jackson testified that he went along with the officers without a word because he believed that he was under arrest. Tr. p. 33. If Jackson had tried to leave, the police would have stopped him. Officer Hurley testified that he and Officer Whitehead were going to "detain him there long enough for us to identify him and secure a warrant." Thus, when Jackson was taken into custody, the only articuable basis for his arrest was that he was a nervous young black man from Los Angeles with one suitcase who did not present any identification upon a police officer's request. These facts do not constitute probable cause for arrest. Florida v. Royer, 103 S.Ct. at 1324, U.S. v. Mendenhall, 446 U.S. at 556, 100 S.Ct. at 1878. Dunaway v. New York, 442 U.S. 200 at 210 n. 12, 99 S.Ct. 2248 at 2255 n. 12, 60 L.Ed.2d 824 at 934 (1979); State v. Key, 375 So.2d 1354 (La.1979); State v. Matthews, 366 So.2d 1348 (La.1978); State v. Washington, 364 So.2d 958 (La.1978). We regard the officers actions in taking Jackson into custody without his consent for the purpose of further interrogation as going beyond the limits of a permissible investigatory stop and constituting an arrest without probable cause. Accordingly, any evidence discovered as a result of this illegal detention, whether with or without Jackson's consent, was tainted and should have been suppressed. Florida v. Royer, supra; Dunaway v. New York, supra.

DECREE
For the above reasons, the judgments of the lower courts are reversed.
REVERSED.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
Defendant Jackson arrived from Los Angeles, California, a recognized source city for drugs, and exited the plane in an unusually slow manner. He continued to appear nervous and apprehensive and repeatedly looked over his shoulder while claiming his one small suitcase. Jackson said he had no identification or airline ticket and told the investigating officers something extremely suspicious: "he didn't know what was in the bag" (Tr. 8). Jackson was asked to accompany the officers to an upstairs office at the airport. According to the officers, Jackson was not under arrest at that time, although he felt that he had no choice in the matter. The facts are closer to those in State v. Ossey, 446 So.2d 280 (La., 1984); State v. Watson, 416 So.2d 919 (La.1982); State v. Salazar, 389 So.2d 1295 (La., 1980); and U.S. v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) than they are to those in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1984).
The detectives in Royer had possession of defendant's airline ticket and had retrieved and retained possession of his luggage, thereby making his flight impossible. Jackson had retrieved his own suitcase after completion of his flight when he was escorted upstairs to the agents' office. Jackson's lack of identification, lack of an airline ticket and ignorance of the contents of his suitcase justified the limited restraint involved in his being escorted to the upstairs office. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
I respectfully dissent.
NOTES
[1] Agent Whitehead and Agent Hurley were the same officers who arrested Frederick Ossey in State v. Ossey, supra.
[2] Since the Drug Enforcement Administration was set up in 1974, federal drug agents have developed "drug courier profiles" that describe the characteristics generally associated with narcotics traffikers. For example, because the Drug Enforcement Administration believes that most drugs enter Detroit from one of four "source" cities (Los Angeles, San Diego, Miami, and New York), agents pay particular attention to passengers who arrive from those places. During the first 18 months of the federal program to intercept drug couriers, agents in Detroit Airport searched 141 persons in 96 encounters. They found controlled substances in 77 of the encounters and arrested 122 persons. U.S. v. Mendenhall, 100 S.Ct. at 1881.
[3] The trial court cites Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) as authority for his finding that the police officers involved "exercised subjective good faith in the search of Charles Jackson's luggage and as such possessed a reasonable belief in the veracity of their probable cause determination." Gates involved the issue of probable cause in the issuance of a search warrant, not a stop and seizure at an airport. The Court determined in Gates that a magistrate, in determining probable cause in the issuance of a search warrant, should look to the "totality of the circumstances" rather than just relying on the two-pronged test defined in the Aguilar and Spinelli decisions. The case never considered a good faith exception to the exclusionary rule.
[4] If the agents reasonably believed the bag contained narcotics, they could have briefly detained the luggage to investigate the circumstances that aroused the suspicion by means that are properly limited in scope, such as exposure to a narcotics detection dog. U.S. v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); State v. Ossey, supra, 446 So.2d at 286.
[5] Officers Hurley and Whitehead testified that they "took him", Tr. p. 15, "escorted him", Tr. p. 15 and 23, and "asked him to accompany us", Tr. p. 8 and 22, to their office on the third floor.