482 So.2d 32 (1986)
STATE of Louisiana
v.
Walter THOMAS.
No. 85-KA-403.
Court of Appeal of Louisiana, Fifth Circuit.
January 13, 1986.
Rehearing Denied February 18, 1986.
*33 John M. Mamoulides, Dist. Atty., Art Lentini, Dorothy A. Pendergast, Asst. Dist. Attys., Twenty-fourth Judicial District, Parish of Jefferson, Gretna, for plaintiff-appellee.
William R. Ary, New Orleans, for defendant-appellant.
Before CHEHARDY, KLIEBERT and CURRAULT, JJ.
KLIEBERT, Judge.
Walter Thomas was charged by bill of information with the illegal possession and intent to distribute Pentazocine in violation of LSA-R.S. 40:967. Prior to trial the defendant filed a motion to suppress any physical evidence in the possession of the state. The motion was denied by the trial court. The defendant then entered a plea of guilty reserving his right to appeal pursuant to State v. Crosby, 338 So.2d 584 (La.1976). The defendant was initially sentenced to 18 months with credit for time served on March 13, 1985. On June 12, 1985, he was resentenced when it was brought to the district court's attention that its previous sentence was illegally lenient. He was resentenced to 4 years (the minimum sentence permitted under the statute) without benefit of probation or parole. We affirm the conviction and sentence.
The facts leading to Thomas' arrest are as follows: On February 25, 1983, defendant, Walter Thomas, arrived at New Orleans International Airport on a flight from Los Angeles, California at approximately 3:05 P.M. Detectives Whitehead and Hurley of the Jefferson Parish Sheriff's office testified that they were conducting a routine investigation of flights arriving from what they believed to be "source" cities of illegal drugs coming into the New Orleans Metropolitan area. Agent Whitehead testified that they became suspicious of the defendant because of his activities following his disembarking the plane.
According to Detective Whitehead he observed the defendant, a young, black male, walking down the concourse toward the main lobby. He testified that the defendant appeared to be "a little nervous". Upon reaching the first available public telephone, the defendant made a brief phone call. Whitehead testified that the defendant was constantly "looking around", which gave him the impression that the defendant was attempting to see if he was under surveillance.
After placing the brief phone call, the defendant entered the first restroom on the concourse. He exited the restroom after a short time and proceeded downstairs to the Delta Airline baggage claim area, where he continued to "look around" and claimed a single, small, brown piece of luggage from the conveyer. He presented a claim check to airport security personnel and was allowed to leave the baggage claim area.
Detective Hurley then approached the defendant and identified himself as a police officer and asked the defendant if he would *34 mind answering a few questions, to which the defendant assented. Then, at the request of Detective Hurley, the defendant produced a valid Louisiana driver's license issued to Walter Thomas. Also, at Detective Hurley's request, he also produced a paid for, with cash, one way ticket to New Orleans issued in the name of James Howard. When asked to explain this discrepancy, the defendant explained that he had traveled to Los Angeles to visit a girl friend and did not want his "old lady" (wife) to know of his activities.
The detectives testified that after they learned the defendant was flying under an alias, they informed him they were conducting a narcotics investigation, and after informing him he was free to refuse, asked if they could examine the contents of his baggage. According to Agent Hurley, the defendant replied: "Go ahead and look, there is no drugs." The detectives were unable to open the luggage at this point because of a lock on the zipper. Agent Hurley asked the defendant for a key. The defendant responded by saying he did not have a key. Therefore, Detective Whitehead went to the unclaimed baggage area to search for a master key with which to open the suitcase.
When they were unable to open the suitcase, Detective Hurley testified that he asked the defendant to accompany the detectives to the third floor narcotics office. The record is unclear as to whether the defendant's driver's license and plane ticket were returned to him. According to the detectives, the defendant agreed to go to their office. It is unclear from the record as to who carried the defendant's bag to the office. When they arrived at the narcotics office, Detective Whitehead asked the defendant to empty his pockets. When the defendant emptied his rear pocket a small key dropped to the floor. Agent Whitehead asked if it was agreeable to the defendant for him to use the key and open the bag, to which, according to the detectives, defendant responded "Go ahead." When detective Hurley opened the bag he found 7,300 sets of Talwin and Tripelennamine Hydrochloride. At that point the defendant was informed of his Miranda rights and placed under arrest.
The defendant agrees that the officers approached him, asked to see some identification and a plane ticket, which he produced. He acknowledged his plane ticket was issued in another name but said he explained the discrepancies to the officers as due to his not wanting his wife to know of his trip to Los Angeles. However, from this point, his version of the encounter differs from that of the officers. Defendant testified that after the initial encounter he was told to stand against a wall while the other officer went to find a master key and at page 32 of the transcript testified as follows:
"But in the meanwhile, while the other officer went to get the keys, he had me against the building, you know, asking me questions, was I carrying any drugs, or any kind of illegal drugs. I told him, `No, I ain't transporting no drugs.' He said, `Do you have a key for it?' I said, `No' because I had lost the key for it. I never did open the suitcase up since I had been in L.A. So, his partner came back with a bunch of keys, you know. And he tried and he tried, and he couldn't open it up. And I asked him, I said, `Can I talk to a lawyer, or anything, you know, talk to somebody else, you know." And I said, `I have to be standing up here like this?' And he said, `Well, you ain't got to stand up here, come on, we're going upstairs.'"
The validity of airport searches on facts very similar to the facts of the instant case have been addressed by the Louisiana Supreme Court in State v. Ossey, 446 So.2d 280 (La.1984) and State v. Jackson, 457 So.2d 660 (La.1984), and by the United States Supreme Court in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
In Ossey and Mendenhall, the courts held the initial encounter by the officers was within the permitted Terry-type investigatory *35 stop[1] and the subsequent detentions and searches were consensual, therefore, no violation of the defendant's fourth amendment constitutional rights against unreasonable searches and seizures was found. On the other hand, in Royer and Jackson, although the initial encounters by the officers were also found to be permissible Terry -type stops, the subsequent moves from a public area to the detective's office was non-consensual and therefore violated the defendant's constitutionally guaranteed fourth amendment rights against unreasonable searches and seizures.
To reach a conclusion as to reasonableness or unreasonableness here, it is necessary to first ascertain the distinction between the Ossey and Jackson cases and then determine whether the situation here is analogous to the Ossey case or to the Jackson case.
In Jackson and Ossey, like the instant case, defendants were approached by the officer who identified himself as a police officer, after having arrived in New Orleans on a flight from Los Angeles. When asked if they would mind answering questions, the officers testified that Ossey responded "Yeah, I don't mind speaking"; Jackson responded "Sure"; and Thomas responded "No, I don't mind". When asked to produce identification, Ossey produced a driver's license and ticket showing different names. Jackson did not produce identification or a ticket. Thomas produced a driver's license in the name of Walter Thomas and a ticket under a ficticious name. Ossey explained that his cousin had purchased his ticket; Jackson explained that he had left his ticket on the plane, and Thomas stated that he used an alias to prevent his "old lady" from knowing of his activities.
At this point, Ossey, Jackson and Thomas were informed that they were the subjects of a narcotics investigation. When asked for permission to search the bag in the baggage area, Ossey refused unless the officers had a warrant; Jackson flatly refused; Thomas assented but said he had no keys. The officers in attempting to move the defendant upstairs said "Let's go," according to Ossey; Jackson stated he was told "We're going to take you upstairs." Thomas testified he was told "Come on, we're going upstairs" and was then grabbed by the arm.
In Ossey, the officers retained the defendant's license and ticket. In Jackson, he offered no property to be retained. In Thomas, the record is unclear if the officers retained his ticket.
In Ossey, Officer Hurley took the defendant's bag upstairs. In Jackson, the defendant retrieved his own bag. In Thomas, the defendant contends that the officers retrieved his bag, while the officers did not state what happened to the bag.
The Ossey and Jackson cases came up to this court[2] on writ applications following the trial courts' denial of motions to suppress the evidence in both cases. Here, although a motion to suppress the evidence was also denied, no writ application was filed. Rather, as previously stated, the correctness of the denial of the motion to suppress is being considered on appeal following a conviction on a Crosby -type guilty plea.
Notwithstanding the denial of all three motions to suppress by the trial judges, only in the Ossey case did the trial judge make the specific finding that the defendant voluntarily accompanied the agents in the spirit of apparent cooperation to the detective's office. As a result of that finding, Justice Marcus, as the organ of the court, applying the applicable standard of review; i.e., the review is to be of the totality of the circumstances and the trial *36 judge's factual determination is to be given great weight, set in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) and State v. Edwards, 434 So.2d 395 (La.1983); State v. Bourgeois, 388 So.2d 359 (La.1980), and concluded:
"Upon a review of the surrounding circumstances, we cannot say that the trial judge's finding of voluntariness was in error. The request to accompany the agents was made in a public place by agents dressed in plain clothes. There was no threat, show of force, or physical touching. The agent's statement to defendant was phrased in the form of a request instead of a demand. Finally, the request was not so overbearingly coercive to defendant as to render his consent involuntarily; he had already refused to allow a search of his bag, thereby demonstrating his knowledge of and ability to exercise his right to decline the agent's requests. Therefore, since defendant voluntarily accompanied the agents, he was not being illegally detained when he consented to the search in the agents' office."
In a footnote to the above quote, Justice Marcus noted in Ossey that it was unclear when the defendant's license and ticket were returned to him, but, even if the agents had possession of the ticket and license when the request was made this would not affect the finding of voluntariness.
On the other hand, in the Jackson case, Justice Blanche, as the organ of the court said:
"The present case differs factually from State v. Ossey and U.S. v. Mendenhall because there was no finding that the defendant voluntarily went with the agents by the trial court. In fact, in the instant case [Jackson] the trial judge indicated he questioned the legality of the detention because in admitting the evidence seized in the search, he created a "good faith' exception to the exclusionary rule."
Thus, in Ossey the supreme court concluded that under the great weight required to be given the trial judge's factual finding under the applicable standard of review, there was no error in the trial judge's conclusion the defendant voluntarily accompanied the detectives to their office. Whereas, in Jackson, the absence of specific trial court finding of voluntariness, the supreme court under its own unrestricted findings of fact concluded that what had begun as a consensual inquiry in a public place escalated into a non-consensual investigatory procedure in a police interrogation room and therefore violated the defendant's constitutional rights against unreasonable searches and seizures.
In the present case, the record does not contain written or oral (transcribed) reasons stating the trial court's basis or reasons for denying the motion to suppress. However, in fixing the defendant's bond pending the appeal, the trial court noted the following:
"This Court is going to raise the defendant's bond to $100,000, cash or commercial property and the Court will state for the record that the reason that it is going to permit this defendant to remain out on bond, pending sentencing, even though there is a mandatory four-year sentence, counsel for the defendant and counsel for the State have discussed with the Court two cases from the Supreme Court of Louisiana, arising out of airport searches in which the Court has reached different results and there appears to be some legal issues that would have to be settled by an appellate court and for that reason, the Court will permit the defendant to be out on a $100,000 bond pending this case on appeal."
Therefore, it is apparent the trial court was aware of the different results reached by the supreme court in the Ossey and Jackson cases when it elected not to give written reasons for denying the motion to suppress.
As we view it, therefore, the decisive question in all three cases is a factual one; i.e., Did the defendant consent to being *37 detained beyond the initial Terry -type investigatory encounter in the public baggage area? The detectives' and the defendant's version of the move from the baggage area to the officers' office differ considerably. In his narrative testimony, Detective Hurley testified: "I asked Mr. Thomas if he would mind accompanying us to our office on the third floor and he said no, he wouldn't." Officer Whitehead said: "We asked Mr. Thomas if he would come with us" and amplified his response on cross-examination as follows:
"Q. The bag was brought upstairs with Mr. Thomas, is that correct?
A. Yes, sir.
Q. And at this time he was free to leave?
A. Yes, sir.
Q. He chose to go upstairs with you all?
A. Agent Hurley asked him if he would mind accompanying us upstairs, and he came with us.
Q. And it was your intention of bringing him up there to search the suitcase, is that correct?
A. Yes, sir."
The defendant, however, testified as follows:
"So just like that, one of them grabbed my suitcase and one of them held my arm as we was walking back through the airport to catch the elevator to go upstairs. Once we got up in the room, they was trying to get a search warrant, trying to get in touch with Judge Collins, I believe that is his name, Collins."
The detectives testified that although the defendant was informed he was not required to permit a search of the suitcase he again consented to the search when they arrived in the office. The defendant denies he consented to the search and points to the failure to sign a consent to search form as support for his contention.
In essence then, the inquiry narrows to a "credibility call" which would best be left to the determination of the initial trier of the facts. Absence such a call by the trier of the fact we are obliged to make it.
As we view the testimony here, the initial encounter by the officers was within the permitted Terry -type investigatory stop and the subsequent detentions and seizures were consensual; therefore, no violation of the defendant's fourth amendment constitutional rights against unreasonable searches and seizures occurred. Accordingly, we affirm the trial court's ruling on the motion to suppress.
Defendant assigns error to his resentencing contending that it was in error in that (1) it amounted to a "punishment" for appealing the judgment of the district court, and (2) it was excessive.
Defendant contends that the resentencing which occurred after his plea of guilty under State v. Crosby, supra, constituted an "impingement" on his right to appeal, pursuant to Crosby.
We cannot see how the defendant's appeal is prejudiced or "chilled" by his resentencing. The trial judge noted that the defendant's case raised meritorious issues on appeal in light of the supreme court's decisions in Ossey and Jackson. Additionally, he allowed the defendant to remain free on an appeal bond despite the fact that he had been sentenced to four years without probation or parole.
La.C.Cr.P. Article 882 provides as follows:
"An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review."
Additionally, La.C.Cr.P. Article 916 provides:
"The jurisdiction of the trial court is divested and that of the appellate court attaches upon the entering of the order of appeal. Thereafter, the trial court has no jurisdiction over the matter except to either:
* * * * * *

*38 (3) Correct an illegal sentence or reduce a legal sentence in accordance with Article 913(B)."
The trial court's initial sentence of eighteen months with credit for time served was clearly illegal and the trial court was correct in resentencing the defendant.
For the reasons stated, therefore, we affirm the conviction and sentence of the trial judge.
AFFIRMED.
NOTES
[1] Investigatory detention permitted in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and in State v. Belton, 441 So.2d 1195 (La.1983) without the necessity of the state proving probable cause for the stop.
[2] State v. Ossey, 435 So.2d 1039 (5th Cir.1983); State v. Jackson, 452 So.2d 703 (5th Cir.1984)