507 So.2d 841 (1987)
STATE of Louisiana
v.
Ronald WILEY.
No. 87-KA-52.
Court of Appeal of Louisiana, Fifth Circuit.
May 1, 1987.
Rehearing Denied June 17, 1987.
*842 John M. Mamoulides, Dist. Atty., John Lee, Dorothy Pendergast, Asst. Dist. Attys., Gretna, for plaintiff-appellee.
Anthony R. Crouse, Lawrence & Lawrence, New Orleans, for defendant-appellant.
Before KLIEBERT, BOWES and GAUDIN, JJ.
KLIEBERT, Judge.
The defendant, Ronald Wiley, and a codefendant, Bobby Jefferson, were charged by bill of information with possession with intent to distribute cocaine in violation of La.R.S. 40:967. Prior to trial the defendants filed separate motions to suppress physical evidence seized pursuant to their arrest. Jefferson's motion was granted; Wiley's denied.[1] Wiley thereafter entered a guilty plea but reserved his right under State v. Crosby, 338 So.2d 584 (La.1976) to seek appellate review of the ruling on his motion to suppress. He was sentenced to five years at hard labor with credit for time served.
Upon lodging of the record this court noted sua sponte that the appeal appeared untimely and requested briefs on the issue. In response defense counsel called our attention to the fact that the trial court granted defendant an out-of-time appeal as authorized by State v. Counterman, 475 So.2d 336 (La.1985). Accordingly, we will maintain the appeal and address the issues raised by defendant.
On July 31, 1985 Ronald Wiley and Bobby Jefferson arrived at New Orleans International *843 Airport on flight 532 from Miami, Florida. Detective Sergeant McClay and Agent Whitehead[2] of the Jefferson Parish Sheriff's Office were conducting a routine surveillance of the passengers disembarking from flight 532 because Miami is considered a source city for drug trafficking into the New Orleans metropolitan area. Plain-clothes narcotics agents are routinely assigned to the airport to detect and apprehend drug traffickers by identifying persons who fit a "drug courier profile," which is in essence the collective experiences and observations of narcotics officers regarding common characteristics of drug couriers. The agents observed Wiley and Jefferson as they walked up the concourse. Wiley was carrying a black leather purse; Jefferson, a garment bag which appeared virtually empty. Wiley and Jefferson looked around "apprehensively" before entering a restroom at the top of the concourse. According to the agents, since Wiley and Jefferson's arrival from a source city and their actions were consistent with the drug courier profile, the agents maintained Wiley and Jefferson under surveillance when they exited the restroom.
Thereafter Wiley and Jefferson entered three gift shops in quick succession, remaining only seconds in the first two shops. Wiley remained in the third shop while Jefferson looked around the terminal lobby and re-entered the shop.[3] Wiley and Jefferson then walked past the stairs leading to the baggage claim area. According to the agents this led them to believe they had no additional baggage.
Wiley and Jefferson exited the terminal and proceeded past the passenger pick-up zone and into the adjacent short-term parking lot, leading the agents to believe they had parked a car in the short-term lot, made a "quick trip" to Miami, and were returning to the car. When Wiley and Jefferson were halfway across the lot the agents approached and identified themselves as police officers. Agent Whitehead advised them that "you don't have to, but would you mind answering questions." According to the agents' testimony, both Wiley and Jefferson agreed to answer questions; neither attempted to walk away, although Wiley paced about "nervously". In response to a request for identification, Wiley produced a military discharge form DE244 from his purse. Jefferson was unable to produce any identification documents. When removing the discharge form from the purse Wiley held the purse close to his body as if to conceal its contents, and his hand shook as he handed the form to Agent Whitehead. When questioned as to who was going to drive the car if neither had a license, Wiley and Jefferson responded that they didn't have a car and were waiting for a friend to pick them up. They did not respond when asked why they were not waiting in the passenger zone instead of walking around the shortterm parking lot. Upon request Wiley produced from his purse two airline tickets in his and Jefferson's names. Again he appeared anxious to conceal the contents of the purse, and his hand shook as he handed the tickets to the agents.[4] On further questioning Wiley and Jefferson related that they lived in Miami, were in New Orleans for a short visit to Wiley's mother, and had no baggage other than what they were carrying.
At that point the agents strongly suspected Wiley and Jefferson were carrying drugs into New Orleans from Miami. They *844 identified themselves as narcotics agents conducting an investigation and voiced their suspicion that Wiley and Jefferson were concealing narcotics in the purse or garment bag. According to the agents, Jefferson immediately replied "we don't have anything" and held out the garment bag. Agent Whitehead then advised "you don't have to if you don't want to but may I examine the contents of your luggage and [person]",[5] to which Jefferson replied "go ahead" and Wiley replied "alright". Jefferson handed the garment bag to Agent McClay, who found that it contained only a shirt, a pair of pants, and a pair of shoes. Agent Whitehead asked Wiley and Jefferson whether they were carrying anything on their person. Jefferson raised his pants legs, said "No, I don't have nothing", and started patting himself down. Agent Whitehead then asked Wiley to raise his pants legs. He quickly raised the right pants leg, whereupon Agent Whitehead observed through Wiley's sheer black sock a white object near the middle of his calf. Agent Whitehead retrieved the object, which was subsequently revealed to be a white envelope containing a white powder ultimately identified as cocaine.
Wiley and Jefferson were then arrested and escorted to the Narcotics Office at the airport. A search of their persons pursuant to the arrests revealed four more clear plastic bags of cocaine in envelopes in Wiley's pockets and two clear plastic bags of cocaine in an envelope concealed in the crotch of Jefferson's pants. Wiley's black purse contained an envelope of cocaine, a set of car keys, and a work order on a Jaquar registered to an Erma Wiley with the Miami address given by Wiley. The car was subsequently located in the shortterm parking lot where Wiley and Jefferson were apprehended.
Wiley testified that after disembarking from flight 532 until they were arrested they stopped at three different gift shops before finding one that sold Winston "hard box" cigarettes. He and Jefferson then walked across the parking lot looking for his brother who was to pick them up. He agreed that the agents approached and asked to see identification and plane tickets which he produced. However, from this point Wiley's version of the events differed substantially from the agents'. Wiley testified that after handing the tickets to the agent:
"... He [one of the agents] said, `Oh, you are from Miami?' and I said, `Yes.' and he said, `You wouldn't have any drugs on you?', and I said, `No, I wouldn't have any drugs on me.' He said, `Where were you going at?' and I said, `I was waiting for my brother, I'm looking for my brother to come pick me up.', so he asked me, he said, he kept saying `You wouldn't have any drugs?' and I said, `No, I don't have any drugs." We went to walk away and I say, `I don't have nothing to say, am I under arrest or whatever it is?' he said, `No, I just want to ask you a couple of question.', and then we went to walk off and Whitehead came behind us and McClay got in front so he say, `Let me ask you a couple of questions?', and I said, `What?', and he said, `Who owns that?', and I said, `That is not mine.'___________he asked about the satchel whith (sic) the clothes in it so after that he asked me, he say, `Do you have any drugs?' and he kept saying, `I like them boots you got on but you wouldn't have any drugs stuck in there?' and I said, `No, nothing.', and so Whitehead came around and he say, `Boy, them some nice boots, they must have cost a lot of money?' and he went patting them down and he felt the bulge so he say, `What's that in your boots, man?' and he pulled my leg up and he pulled it out my boots and that is when he said, `You are under arrest.'.
Q. Mr. Wiley, did you attempt to walk away from these Officers prior to this pat down?

*845 A. Yes, three or four times, I told him I didn't have anything and I don't know why he stopped me.
Q. Where was Officer Whitehead when he felt your boots, what position was he in?
A. Well, first he was behind me because McClay was here and Whitehead came around when he started talking about them boots and did I have anything in them, he reached down and that is when he patted my boots.
Q. Did you ever consent to be searched?
A. No.
Q. Did he ever ask you if you could be searched?
A. No.
Q. Did you ever talk about being searched?
A. No.
Q. Did you ever discuss being searched?
A. No.
Q. Did he ever ask you if you could be searched?
A. Yes and I said, `No', I said, `Search me for what, I don't have anything."
Q. The boots that you had on, do you have them on now?[6]
* * * * * *
A. Yes
Q. Where were the drugs?
A. Inside the boots.
Q. Zip them down, let me see. Were they in both boots?
A. No.
Q. And these are the pants that you had on?
A. Exactly
Q. Did you ever lift you pants legs up?
A. No. I didn't." (Footnote added)
Jefferson testified that when the agents approached:
"A. I told Ronald that we didn't have to say anything. We was walking on and all of a sudden, Officer Whitehead the one that was up here, he got in the front like this (Witness indicating.) and we was like in between a car here. And one was here and one was there and we was walking onto the parking and McClay was standing here and so he said we were under some kind of narcotics project that he was doing at the airport and then he said, `Do you all have any I.D.?'
Q. And did you have any identification?
A. I didn't, no, sir, I left mine prior to changing to come up here.
Q. Do you remember what happened then, do you remember when the drugs were found, can you tell us about that?
A. Well, he asked can he search us and we didn't say nothing. He didn't say nothing so all of a sudden McClay grabbed my luggage bag and started going through my luggage bag and he told me to turn around and I turned around on the car and he searched me, he searched me down, he say he didn't but he searched me down and Officer Whitehead told Ronald that those were nice boots he got on and he asked him did he have any I.D.?
Q. Did Ronald pull his pants leg up?
A. Not that I can recall.
Q. Did you pull your pants leg up?
A. No, sir.
Q. Did you tell these Officers that they could search you?
A. No, sir.
Q. Did you hear Ronald Wiley tell the Officers that they could search you?
A. No.
Q. Did you all attempt to get away from these Officers at any time?

*846 A. Well, we tried to walk away, one was to the left and one was to the right.
Q. Was it impossible for you to walk away from Officers at that point?
A. Well, I'm quite sure that they would have stopped us if we did."
Wiley's motion to suppress was heard, argued and submitted on December 6, 1985. The court took the matter under advisement in order to research the latest jurisprudence on the issue and subsequently denied the motion, giving the following reasons:
"... the Court concludes as to the threeprong tests was met in connection with his arrest. He did warrant being stopped by the profile presented to police officers.
The Court believes that he voluntarily submitted to a cursory search to his person. At the time of the search, contrabandillegal contraband was discovered..."
On appeal Wiley raises the following issues as related to the denial of his motion:
1. Whether a citizen is seized within the meaning of the Fourth Amendment, and Article I, Section 5 of the Louisiana Constitution when police officers inform the citizen that they are narcotics officers and suspect the citizen of transporting narcotics?
2. Whether Ronald Wiley, who initially consented to the stop, was "seized" thereafter once the officers exhibited an intent to effect his extended restraint?
3. Whether the officers had reasonable suspicion or probable cause to effect an extended restraint of Ronald Wiley?
4. Whether Ronald Wiley's "consent" to a search of his person was tainted by his unlawful detention, dictating the suppression of the evidence?
The validity of airport detentions and searches on facts similar to the facts of the instant case has been addressed by the United States Supreme Court in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), by the Louisiana Supreme Court in State v. Ossey, 446 So.2d 280 (La.1984) and State v. Jackson, 457 So.2d 660 (La.1984), and most recently by this court in State v. Thomas, 482 So.2d 32 (5th Cir.1986). In Royer, supra, the United States Supreme Court noted at 460 U.S. 498-99; 103 S.Ct. 1324:
"... law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. See Dunaway v. New York, supra, 442 U.S. [200] at 210, n. 12, 99 S.Ct. [2248] at 2255, n. 12 [60 L.Ed.2d 824 (1979)]; Terry v. Ohio, 392 U.S. [1] at 31, 32-33, 88 S.Ct. [1868] at 1885-1886 [20 L.Ed.2d 889 (1968)] (Harlan, J., concurring); id., at 34, 88 S.Ct., at 1886 (WHITE, J., concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. United States v. Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. Terry v. Ohio, 392 U.S., at 32-33, 88 S.Ct., at 1885-1886 (Harlan, J., concurring); id., at 34, 88 S.Ct. at 1886 (WHITE, J., concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. United States v. Mendenhall, supra, 446 U.S., at 556, 100 S.Ct., at 1878 (opinion of Stewart, J.). If there is no detentionno seizure within the meaning of the Fourth Amendmentthen no constitutional rights have been infringed."
The court in Mendenhall stated at 446 U.S. 554, 100 S.Ct. 1877:

*847 "We conclude that a person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."
In the instant case, as in Ossey, supra, the two crucial issues are whether the defendant was being illegally detained at the time of his consent to the search and whether he freely consented to the search. The initial encounter between the defendant, Jefferson and the agents in the parking lot was not a "seizure" as contemplated by the Fourth Amendment. The purpose of the Fourth Amendment is not to eliminate all contact between law enforcement officers and citizens, and as long as a reasonable person would feel free to disregard the encounter and walk away, there has been no "seizure". State v. Ossey, supra; State v. Jackson, supra; Florida v. Royer, supra; United States v. Mendenhall, supra.
Moreover, although the defendant is "seized" for Fourth Amendment purposes, law enforcement officers have the right to stop and interrogate persons reasonably suspected of criminal conduct. La.C.Cr.P. art. 215.1; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Ossey, supra; State v. Belton, 441 So.2d 1195 (La.1983). "Reasonable cause" for such an investigatory detention is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. State v. Ossey, supra; State v. Belton, supra.[7]
Defendant contends that when the "seizure" occurred there did not exist sufficient articulable facts to justify a Terry-type stop. We disagree.
In this case, the following circumstances existed to support a belief that the defendant was engaging in criminal activity: 1) he and his companion were arriving from a source city; 2) the defendant appeared nervous; 3) the two men delayed exiting the airport, stopping at a bathroom and three gift shops; 4) they were carrying a minimal amount of luggage, consisting of one suiter which appeared empty and a purse; 5) they did not claim any luggage from the baggage area; 6) when approached by the officers, the defendant became visibly nervous and started pacing; 7) although they alleged that someone was picking them up at the airport, they were walking in the short-term parking lot instead of waiting at the pick-up area; 8) neither man was in possession of a driver's license; Jefferson had no indentification whatsoever; and, 9) both times the defendant removed papers from the purse, he held it as though trying to hide its contents, he was visibly nervous and his hands were shaking. These were clearly adequate grounds for a reasonable belief that the defendant and Jefferson were carrying drugs; hence, the "seizure" was a permissible Terrytype detention. See and compare State v. Ossey, supra; State v. Salazar, 389 So.2d 1295 (La.1980); State v. Thomas, supra.
The agents' conduct during this "seizure" did not, as contended by defendant, exceed the scope of a lawful Terry-type stop. Unlike the factual scenarios in Ossey, Jackson and Thomas, the agents did not escort the defendant and Jefferson to a squad room for questioning. Rather, they remained in the parking lot and asked the defendants to consent to a search of their baggage and persons. Having concluded the agents had a reasonable belief the defendant and Jefferson were carrying drugs, our next inquiry is whether the search in the parking lot was with the consent of the defendant, Wiley. The agents testified that Wiley and Jefferson consented; whereas, the defendant avers they did not. The trial judge was thus faced with a credibility choice, and in finding *848 that the searches were voluntary, apparently concluded the agents' testimony to be more credible than that of the defendant. Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case, and factual determinations of the trial judge are entitled to great weight on appellate review. State v. Ossey, supra; State v. Edwards, 434 So.2d 395 (La.1983); State v. Thomas, supra. Based on our review of the record, we cannot say the trial judge erred in finding that the defendant and Jefferson consented to the search. As the consent search was permissible, the trial judge correctly denied the motion to suppress the drugs seized from the defendant's sock.
Once the cocaine was seized from the defendant's sock, the officers had probable cause to arrest the defendant.[8] Once a lawful arrest has been made, a warrantless search of the arrestee's person and of the area within his immediate control is permissible in order to remove any weapons from the defendant and to prevent evidence from being destroyed. State v. Andrishok, 434 So.2d 389 (La.1983). Thus, the officers could search the defendant's purse and coat, and the six packets of cocaine found pursuant to that search were lawfully seized.
Accordingly, for the reasons assigned the ruling of the trial judge denying the motion to suppress is affirmed, as is the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] The charge as against Jefferson was dismissed in light of the ruling on his motion to suppress. The basis for the ruling on Jefferson's motion was that the initial cache of drugs was discovered on Wiley's person; no contraband was found on Jefferson's person until after he was arrested.
[2] Agent Whitehead participated in the arrests of Frederick Ossey in State v. Ossey, 446 So.2d 280 (La. 1984); Charles Jackson in State v. Jackson, 457 So.2d 660 (La.1984), and Walter Thomas in State v. Thomas, 482 So.2d 32 (5th Cir.1986). The issues raised in the cited cases are likewise raised in the present case.
[3] In their testimony during the motion to suppress the agents did not indicate whether they observed the defendants in the shops. However, when testifying at a previous preliminary examination Agent McClay related the subjects did not purchase anything in the first two shops; he lost sight of them in the third shop. The defendants testified they were searching for Winston cigarettes in a box. The first shop had none, the second did not sell cigarettes, and they purchased a pack at the third shop.
[4] The record is unclear as to whether the agents retained the discharge form and tickets or immediately returned them to Wiley.
[5] At the preliminary hearing Agent McClay related that Agent Whitehead asked for permission to search "your bag and person". At the motion to suppress McClay said "luggage and purse"; Whitehead said "person and their luggage".
[6] Defendant sought to prove that the boots he was wearing on the day of the arrest were too tall for the agents to have been able to see his calves. Agent McClay related that Wiley was wearing lace-up shoes when arrested; when pressed, he admitted he really didn't remember. The bondsman who posted bail for Wiley testified he was wearing ankle high "fruit boots". Agent Whitehead testified Wiley was wearing ankle high boots which were not as tall as the ones he was wearing in court.
[7] In Terry v. Ohio, the court defined the grounds for a limited seizure as an "articulable suspicion" of criminal activity.
[8] Probable cause to arrest without a warrant exists when the facts and circumstances within the arresting officer's knowledge, or of which he has reasonably trustworthy information, are sufficient to justify a person of ordinary caution in beleiving that the person to be arrested has committed or is committing a crime. State v. Ruffin, 448 So.2d 1274 (La.1984).