547 So.2d 1367 (1989)
STATE of Louisiana
v.
Wallace DAVIS.
No. 89-KA-134.
Court of Appeal of Louisiana, Fifth Circuit.
July 31, 1989.
*1368 Warren G. DeAgano, Jr., New Orleans, for defendant-appellant.
Harold Buchler, William C. Credo, III, Dorothy Pendergast, Asst. Dist. Attys., Research and Appeals, Gretna, for State.
Before BOWES, DUFRESNE and WICKER, JJ.
BOWES, Judge.
Defendant, Wallace Davis, appeals his conviction for possession with intent to distribute a controlled dangerous substance. LSA-R.S. 40:967. We affirm.
Mr. Davis was charged by bill of information for possession of five kilograms of cocaine with intent to distribute. At his arraignment, he pled not guilty as charged and then filed a motion to suppress evidence, which was denied. On January 17, 1989, the defendant entered a plea of guilty as charged, reserving his right to appeal the denial of his motion to suppress in accordance with State v. Crosby, 338 So.2d *1369 584 (La.1976). The trial judge accepted the Crosby plea and sentenced the defendant to fifteen years in the custody of the Department of Corrections, with credit for time served. This appeal followed.
The facts of this case are as follows:
On June 7, 1988, Detective Glenn Davis of the Jefferson Parish Sheriff's office was detailed to conduct surveillance of certain arriving and departing flights at the New Orleans International Airport[1]. Sam Brown, an agent with the U.S. Immigration and Naturalization Service, was assisting Davis on the detail. Agent Brown's participation was limited to providing assistance should Detective Davis encounter a situation involving aliens. Detective Davis and Agent Brown positioned themselves at the airport to observe the arrival of Continental Airlines flight 1248, a non-stop flight from Los Angeles to New Orleans. The flight was scheduled to arrive at approximately 1:25 p.m. on June 7, 1988. This particular flight was selected for surveillance because Los Angeles is recognized as a source city for drugs illegally transported into the New Orleans area.
When flight 1248 arrived, defendant Wallace Davis was among the first group of passengers to deplane. Mr. Davis' nervous demeanor, such as looking around to see if he was being watched or followed, immediately attracted the attention of the officers and Detective Davis decided to place the defendant under observation. As he walked along the concourse toward the airport terminal, defendant Davis kept looking over his shoulder and from side to side, apparently trying to see if anyone was watching or following him.
Upon reaching the airport terminal, the defendant proceeded downstairs to the baggage claim area, still looking around to determine whether he was being watched or followed. The baggage from the flight had not yet reached the claim area when the defendant arrived there. Mr. Davis nervously paced around the claim area, looking outside at the passenger pick-up area as if to check for the arrival of someone meeting him. When the baggage did reach the claim area, Mr. Davis picked up a gray suitcase and walked over to the claim area exit, where he gave the attendant a receipt for the suitcase.
The defendant then went outside to the passenger pick-up area and stood there for about a minute, apparently looking for someone in particular to meet him. Thereafter, Mr. Davis picked up his suitcase and walked over to the cab stand in a hurried and nervous fashion. He engaged in a brief conversation with a cabdriver and then gave the gray suitcase to the driver. Both Mr. Davis and the cabdriver walked to the rear of the cab, where the driver placed the suitcase in the trunk. At that point Detective Davis approached the defendant, identified himself as a police officer and asked if he might speak to the defendant.[2] Mr. Davis replied, "Sure". The detective asked where the defendant was coming from; and Mr. Davis responded that he had just flown in from California. Asked to be more specific, the defendant stated that he was arriving from Los Angeles.
Detective Davis then asked if the defendant would mind producing his airline ticket and some form of identification, and the defendant verbally agreed. He handed the detective his airline ticket and a California driver's license. Detective Davis observed *1370 that Mr. Davis was acting more nervous and that the defendant's hands were trembling as he turned over the airline ticket for inspection. The detective noticed that the airline ticket was a one-way ticket purchased with cash and was issued to Wallace Davis, the same name as found on the driver's license. After inspecting the ticket, Detective Davis asked the defendant about the nature of his travel to New Orleans; and the defendant replied that he was in New Orleans for a few days to attend a function for his daughter. In response to the Detective's further inquiry, the defendant stated that this was his first visit to New Orleans in two years. Detective Davis noticed that, as the conversation progressed, the defendant became even more nervous, with his speech breaking and his breathing becoming labored.
Detective Davis then told the defendant that he was a narcotics officer assigned to the airport. He asked Mr. Davis if he was carrying any contraband or drugs, and the defendant responded that he was not. Detective Davis asked the defendant if he would allow the detective to inspect the contents of the gray suitcase. The defendant expressly agreed to the inspection stating, "Sure, go ahead. I don't have anything inside of it." Noting that the suitcase was locked, Mr. Davis said, "Wait, it's locked. Let me give you the key." The defendant then removed a luggage key from his trouser pocket and handed it to the detective, who unlocked and opened the suitcase. The top item in the suitcase was a jacket, in the pocket of which was an airline ticket reflecting that Wallace Davis had flown from New Orleans to Los Angeles the previous evening. When asked about this ticket, the defendant admitted that he had flown to Los Angeles the day before, but contended that the purpose of the flight was to attend to a business matter. Detective Davis observed that the defendant's nervousness increased dramatically after the discovery of this second airline ticket.
Continuing the inspection of the suitcase, Detective Davis found a gray velour running suit covering a package. He removed the package for further inspection. Gift wrapping had been placed rather loosely around the outside of the package. Beneath the gift wrap, the package was covered with plain brown wrapping paper. Detective Davis looked beneath the brown wrapping paper and discovered smaller packages wrapped in tape. He also smelled a strong fragrance emanating from the inside of the package. From previous special training and experience, Detective Davis knew that a fragrance is often used to disguise the scent of cocaine in an effort to thwart detection by trained drug detection dogs. Believing that the small packages contained narcotics, Detective Davis arrested Wallace Davis. Laboratory testing confirmed that the small packages contained a total of five kilograms of cocaine.
Detective Davis, Agent Brown and the defendant testified at the hearing on the motion to suppress. The testimony of these witnesses does not reveal any substantive dispute over the facts leading up to the arrest of Mr. Davis. The defendant, in his testimony, contended that he did not feel free to leave the area once Detective Davis approached him. Mr. Davis admitted, nevertheless, that he consented to the detective's request to question him. The defendant also characterized himself as being "very co-operative" toward Detective Davis. However, Mr. Davis further testified that he felt constrained to cooperate with Detective Davis.
The trial court found that there was reasonable cause to detain Mr. Davis at the airport and that Mr. Davis voluntarily consented to the search of his suitcase, and the defendant's motion to suppress was denied.
On appeal the appellant raises three assignments of error:
1. The trial court erred in denying the motion to suppress and finding that there was reasonable cause to stop appellant Davis.
2. The trial court erred in denying the motion to suppress and finding that the cursory stop did not evolve into a Fourth Amendment "seizure".
*1371 3. The trial court erred in denying the motion to suppress and finding that the search was voluntary.
ASSIGNMENT OF ERROR NUMBER ONE
The court erred in denying the motion to suppress and finding that there was reasonable cause to stop appellant Davis.
The appellant contends that his detention at the airport violated the Fourth Amendment of the United States Constitution and Article 1, Section 5 of the Louisiana Constitution because Detective Davis did not have reasonable cause to stop him. In his brief, appellant asserts that the case involves an investigatory stop arising out of the drug courier profile. According to appellant, "Our Courts have upheld certain stops pursuant to this label and has [sic] overruled other stops. However, our Courts have consistently required the establishment of reasonable and articulable suspicion that one has engaged in criminal activity. The mere fact that a defendant's behavior correlates with various elements of the drug courier profile does not in itself provide reasonable and articulable suspicion."
The United States Supreme Court recently addressed an argument quite similar to appellant's in U.S. v. Sokolow, ___ U.S. ___, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Because of the Sokolow decision's importance in airport detention cases such as this, a detailed analysis of the decision is appropriate, as is a review of the significant jurisprudence leading to the Sokolow decision.
The Fourth Amendment of the United States Constitution protects individuals against unreasonable searches and seizures by government officials. This right of personal security applies to the states through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
Unreasonable searches, seizures and invasions of privacy are prohibited by Article 1, Section 5 of the Louisiana Constitution. These personal security rights granted by the Louisiana Constitution are not mere duplicates of those granted by the Fourth Amendment. Rather, the rights described in Article 1, Section 5 of the Louisiana Constitution afford a higher standard of individual liberty than that granted by the federal constitution, as interpreted by the jurisprudence. State v. Hernandez, 410 So.2d 1381, 1385 (La.1982); State v. Church, 538 So.2d 993, 996 (La.1989).
A warrantless search and seizure is unreasonable per se unless justified by a specific exception to the warrant requirement. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). One such exception was created by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). After Terry, certain seizures were justifiable under the Fourth Amendment if there existed reasonable suspicion that a person had committed or was about to commit a crime. According to the Court in Terry:
... [i]n justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. [footnotes omitted; emphasis added] 392 U.S. at 21; 88 S.Ct. at 1880.
Terry recognized that not all encounters between police and citizenry amount to Fourth Amendment seizures. The Supreme Court delineated the boundaries between a seizure and a consensual encounter by defining a Fourth Amendment "seizure" in the following terms: "Obviously, not all personal intercourse between policemen and citizens involves `seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred." 392 U.S. at 19, fn 16; 88 S.Ct. at 1879, fn 16.
*1372 Although not specifically stated in Terry, U.S. v. Brignoni-Ponce, 422 U.S. 873; 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) unequivocally stated that reasonable suspicion of criminal activity warranted a temporary seizure to conduct questioning limited to the purpose of the stop[3].
In U.S. v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) the U.S. Supreme Court first considered the subject of Terry type investigatory stops at airports. In that case, two narcotics agents decided to follow the defendant after observing her deplane at the Detroit Airport. The defendant fit certain characteristics of the drug courier profile because she was arriving from a known source city for drugs entering Detroit, she was the last to deplane, and she acted very nervous. She went past the baggage claim area without claiming any baggage, and she changed airlines for her departure trip from Detroit. The agents approached the defendant, identified themselves as federal agents and asked the defendant to produce her airline ticket and some form of identification. The defendant gave the agents her airline ticket and a driver's license, each of which was in a different name. After some further questioning, the officers identified themselves as federal narcotics agents and asked the defendant to accompany them to their office in the airport for further questioning. The defendant went with the agents to an office where she was questioned and ultimately searched, with her consent. Heroin was found on the defendant's person.
The members of the Supreme Court issued a plurality decision in Mendenhall, supra. Two of the justices concluded that the entire encounter between the agents and the defendant was consensual and that a Fourth Amendment seizure had not occurred. Three justices reached the conclusion that the defendant had been subjected to a Fourth Amendment seizure, but that reasonable suspicion of criminal activity justified the seizure. These five justices combined to constitute the majority of the Court. The four dissenting justices expressed the opinion that an illegal seizure had taken place because the agents lacked reasonable suspicion to support detention of the defendant.
Justice Stewart, writing for himself, and Justice Rehnquist, in Mendenhall, reaffirmed the Terry definition of "seizure" and made the following explanatory comments regarding Fourth Amendment seizures:
As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification ...
We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. [emphasis added]. 446 U.S. at 554, 100 S.Ct. at 1877.
In a footnote to the foregoing statement, Justice Stewart pointed out: "We agree with the District Court that the subjective intention of the D[rug] E [nforcement] A[gency] agent in this case to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent." (annotation supplied) 446 U.S. at 554 fn 6, 100 S.Ct. at 1877, fn 6.
Justice Powell, writing a concurring opinion in Mendenhall, for himself, Chief Justice Burger and Justice Blackmun, specifically referred to the statements of Justice Stewart quoted above and noted that he did not necessarily disagree with the views expressed in that language. For Justice Powell, however, the question of whether the defendant in Mendenhall was "seized" was extremely close. 446 U.S. at 560, fn 1, 100 S.Ct. at 1880, fn 1.
*1373 The above quoted language from Justice Stewart's opinion in Mendenhall is significant because it represents the view, apparently espoused by a majority of the justices, that the totality of the circumstances should be considered by a court to determine whether a person has been seized for Fourth Amendment purposes.
The United States Supreme Court once again addressed airport detentions in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The defendant in Royer attracted the attention of two narcotics detectives at the Miami Airport because his characteristics and actions fit the drug courier profile. After observing the defendant for some time, the detectives approached the defendant, identified themselves as policemen, and asked if he would speak to them. The defendant said yes, and the detectives asked him to produce his airline ticket and driver's license, which were in different names. When the detectives asked the defendant about the discrepancy, the defendant became noticeably nervous. The detectives then identified themselves specifically as narcotics officers and told the defendant that they had reason to suspect he was transporting illegal drugs. The detectives asked the defendant to accompany them to an office, described by one of the detectives as a large storage closet. Without saying anything, the defendant accompanied the detectives to the office where his luggage was searched after one of the detectives retrieved the luggage from the airline without the defendant's consent or agreement. The luggage was found to contain marijuana.
After considering the facts surrounding the defendant's detention at the airport, the majority in Royer, supra, concluded that the law enforcement officers had gone beyond the limits of a permissible Terry-type stop: "What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions ... as a practical matter, Royer was under arrest." 460 U.S. at 503, 103 S.Ct. at 1319.
In rejecting the State's contention that the encounter between the officers and the defendant was consensual and did not amount to a seizure, the majority, in Royer, considered all of the circumstances surrounding the defendant's detention, and quoted language from Justice Stewart's opinion in Mendenhall as authority for this approach called "totality of the circumstances" in determining if a seizure occurs. 460 U.S. at 501-502; 100 S.Ct. at 1326.
The Supreme Court has recently chosen to revisit the area of airport detentions in U.S. v. Sokolow, ___ U.S.___, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The central issue explored in Sokolow is the role of the drug courier profile in establishing reasonable suspicion justifying a Terry-type stop.
The defendant and a companion in Sokolow purchased two round trip tickets at the Honolulu Airport for a flight to Miami, a source city for illegal drugs. The defendant purchased the tickets with cash from a large roll of $20 bills. The return dates on the tickets were left open. Neither the defendant nor his companion checked any of the four pieces of luggage they were carrying. The airline agent who sold the tickets noticed that the defendant seemed nervous. After the defendant and his companion left for their flight, the airline agent contacted the Honolulu Police Department and conveyed the details surrounding defendant's ticket purchase. Upon investigation, the authorities learned that the name under which the defendant was travelling did not match the name listed for the home telephone number provided to the airline agent by the defendant. The authorities subsequently learned that the defendant scheduled himself to return to Honolulu only three days after he had left. During a stopover on the return flight, Drug Enforcement Agency (DEA) officers maintained surveillance of the defendant and observed that he was very nervous and kept looking all around the waiting area. When the defendant and his companion arrived at the Honolulu Airport, the defendant was still wearing the same clothes he had worn for his departure and he had not *1374 checked any baggage for the return trip. As the defendant and his companion were hailing a cab outside the airport, four DEA agents approached them. One of the agents displayed his credentials, grabbed the defendant's arm, and moved him back onto the sidewalk. The agent asked the defendant for his airline ticket and some identification, but the defendant replied that he had neither. He told the agents that his name was "Sokolow", but that he was travelling under his mother's maiden name. The defendant and his companion were taken to the DEA Office at the airport where the luggage they were carrying was examined by a drug detector dog. The dog became alerted by the defendant's shoulder bag. The agents arrested the defendant and obtained a warrant to search the luggage. Ultimately, cocaine was found inside the luggage. After his motion to suppress was denied, the defendant entered a conditional plea of guilty to the charge of possession with the intent to distribute cocaine. On appeal, the U.S. Ninth Circuit Court of Appeals reversed the defendant's conviction, holding that the DEA agents did not have reasonable suspicion to justify the defendant's detention at the Honolulu Airport. U.S. v. Sokolow, 831 F.2d 1413 (9th Cir.1987). The Supreme Court granted certiorari and reversed.
The majority opinion in Sokolow, authored by Chief Justice Rehnquist, reviewed and rejected the test used by the Ninth Circuit for evaluating the probative value of the drug courier profile factors in establishing reasonable suspicion. Under that test, facts bearing on reasonable suspicion were divided into two categories. The first category consisted of facts describing "ongoing criminal activity", such as use of an alias or evasive movement through an airport and at least one such factor must always be present to support a finding of reasonable suspicion. The second category consisted of facts describing "personal characteristics" of drug couriers, such as cash payment for tickets, nervousness and a short trip to a source city for drugs. The Ninth Circuit believed that these "personal characteristics" were relevant only if there was evidence of ongoing criminal activity, since such characteristics may be exhibited by innocent persons. Applying this two-part test to the facts of Sokolow, the Ninth Circuit found that reasonable suspicion to stop the defendant did not exist because evidence of "ongoing criminal activity" was not present.
The Supreme Court assumed that a Fourth Amendment seizure occurred in Sokolow and then made the following observations about level of proof required to establish reasonable suspicion:
The Fourth Amendment requires `some minimal level of objective justification' for making the stop. (citation omitted). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means `a fair probability that contraband or evidence of a crime will be found', United States v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause. ___ U.S. at ___, 109 S.Ct. at 1585 (1989).
The court then discussed the concept of reasonable suspicion and announced the following standard for evaluating whether reasonable suspicion for a stop exists:
The concept of reasonable suspicion, like probable cause, is not "readily, or even usefully, reduced to a neat set of legal rules." We think the Court of Appeals' effort to refine and elaborate the requirements of "reasonable suspicion" in this case create unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment. In evaluating the validity of a stop such as this, we must consider "the totality of the circumstancesthe whole picture." United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). [emphasis supplied]. ___ U.S. at ___, 109 S.Ct. at 1585.
The majority opinion in Sokolow then went on to quote its earlier language from United States v. Cortez, 449 U.S. 411 at 418, 101 S.Ct. 690 at 695, 66 L.Ed.2d 621 (1981):

*1375 The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same and so are law enforcement officers. [emphasis supplied] ___ U.S. at ____, 109 S.Ct. at 1585.
The Sokolow opinion dealt directly with the probative value of the factors comprising the drug courier profile:
We do not agree with respondent [Sokolow] that our analysis is somehow changed by the agents' belief that his behavior was consistent with one of the DEA's "drug courier profiles." A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a "profile" does not somehow detract from their evidentiary significance as seen by a trained agent. [footnote, reference omitted; emphasis supplied] ___ U.S. at ____, 109 S.Ct. at 1587.
A fair reading of the Sokolow opinion indicates that the specific and articulable facts to which a law enforcement officer must be able to point in justifying an investigatory stop are to be evaluated in light of all circumstances surrounding the particular incident. A court's inquiry into the existence of reasonable suspicion should entail practical consideration of the cumulative effect of all facts articulated by the officer, further taking into account the probative value of such facts to the trained law enforcement official observing them. Any attempt to refine this "totality of the circumstances" standard for reasonable suspicion is invalid. As the Supreme Court has stated in Royer, supra:
Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment. 460 U.S. at 506-507, 103 S.Ct. at 1329.
La.C.Cr.P. art. 215.1A which provides for the authority of law enforcement officers in this state to conduct investigatory detentions provides that:
A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
The Louisiana Supreme Court has dealt with airport detentions on several occasions. In State v. Washington, 364 So.2d 958, 959, 960 (La.1978) two federal agents stopped the defendant at the New Orleans International Airport on the basis of the defendant's conduct conforming with the drug courier profile. In particular, the defendant appeared nervous while walking through the airport concourse. He kept looking over his shoulder to see if he was being followed; and he stopped to make a brief telephone call. The agents assumed that the defendant was arriving from Los Angeles, a source city for illegal drugs entering New Orleans. After the defendant approached the baggage claim area without claiming any luggage, the agents stopped and searched him. They found heroin and cocaine. In reversing the defendant's conviction, the Court pointed out that the drug courier profile factors relied on by the agents to establish reasonable suspicion were equally consistent with the innocent behavior of an arriving traveler expecting someone to meet him at the airport. The Washington Court held that drug courier profile characteristics, alone, do not establish reasonable suspicion when such characteristics are consistent with innocent behavior; and those characteristics must be supplemented with additional indicia of criminal activity on the suspect's part.
In State v. Matthews, 366 So.2d 1348, 1351, 1352 (La.1978), the Court once again reversed a conviction involving the drug courier profile. In that case, law enforcement *1376 officers had received general information describing a rather broad group of people suspected of transporting illegal drugs through the New Orleans Airport. The defendant, an arriving traveler from the West Coast, fit this general description and the agents placed him under observation. The defendant acted nervously and kept looking behind himself to see if he was being followed. When the defendant picked up a single piece of luggage without surrendering his claim check, the officers stopped and ultimately searched him, finding PCP. Reversing the defendant's conviction, and finding the case largely indistinguishable from Washington, supra, the Court concluded that the defendant's behavior, although fitting certain characteristics of the drug courier profile, was consistent with the activities of an innocent traveler. Moreover, the general description of suspects provided to the officers was too broad to have any validity. Thus there was no reasonable suspicion justifying an investigatory detention of the defendant.
In State v. Brown, 370 So.2d 547 (La. 1979), the Louisiana Supreme Court took the opportunity to clarify its rulings in Washington and Matthews. Two police officers in Brown received information that a suspect fitting a certain description would be carrying narcotics aboard a flight from Los Angeles to New Orleans. Officers watched all arriving flights from Los Angeles and spotted a suspect fitting the description. They observed the suspect acting nervously and constantly looking over his shoulder. The suspect claimed only one bag at the baggage claim area. This behavior fit the drug courier profile and the officers stopped the suspect. Heroin was discovered in the suspect's suitcase. The Court reversed the defendant's conviction because evidence pertaining to the drug courier profile was improperly admitted during the trial as such evidence is not relevant to the issue of guilt at the trial on the merits. However, the Court affirmed the trial court's denial of the defendant's motion to suppress, in which the defendant contended that the officers lacked reasonable suspicion for the investigatory detention. The Court held that the detailed description of the defendant, as corroborated by the officers' observation of the defendant at the airport, combined with the drug courier profile characteristics exhibited by the defendant, were sufficient to produce reasonable suspicion justifying the investigatory stop. In reaching that conclusion, the Court clarified its holdings in Washington and Matthews as follows:
It is now well established that the mere fact that a defendant's behavior while under surveillance at the airport correlates with various elements of a drug courier profile does not by itself provide reasonable cause to stop and detain him for questioning. State v. Washington, 364 So.2d 958 (La.1978); State v. Matthews, 366 So.2d 1348 (La.1978). However, it does not follow that such factors are to be wholly disregarded in determining whether reasonable cause exists. Components of the profile, and defendant's conformance thereto, may be considered, along with other relevant information known to the officer, in evaluating whether he had reasonable cause to stop and detain a defendant. [emphasis supplied] 370 So.2d at 549.
An analysis of the foregoing statement of the law in Brown, supra, indicates the Louisiana Supreme Court's adoption of the "totality of the circumstances" as the standard for determining the existence of reasonable suspicion. This, of course, is totally consistent with the U.S. Supreme Court's recent holding in U.S. v. Sokolow, supra.
In the wake of U.S. v. Mendenhall, supra, and Florida v. Royer, supra, the Louisiana Supreme Court decided State v. Ossey, 446 So.2d 280 (La.1984). Two officers assigned to flight surveillance duty at the New Orleans airport became suspicious of the defendant as he deplaned a flight from Los Angeles.[4] His behavior fit certain characteristics of the drug courier profile and the officers decided to follow him. The *1377 defendant acted nervously and looked around to see if he was being observed. He stopped several times to look over his shoulder as he was going to the baggage claim area. He then claimed one small bag from the baggage claim area. As the defendant left the airport building, one of the officers approached him, displayed his badge, and asked if the defendant would speak to him. The defendant agreed, and produced his airline ticket and driver's license in response to the officer's request. The ticket and the license were in different names. The ticket was for a one-way trip and was purchased with cash. After some further questioning, one of the officers informed the defendant that they were investigating narcotics matters and that they believed the defendant was transporting illegal drugs. A search of the defendant's luggage at the police department's airport office ultimately revealed that he was carrying narcotics. In Ossey, the Court reviewed the Mendenhall and Royer decisions in detail. The facts in Ossey, however, differed materially from Royer. The defendant in Ossey, was not "seized" for Fourth Amendment purpose until the officer advised him of the narcotics investigation they were conducting and that they suspected him of transporting illegal drugs. This amounted to a show of authority sufficient to constitute seizure of the defendant. Ossey, supra at 285. Referring to its previous decision in State v. Belton, 441 So.2d 1195 (La.1983), the court, in Ossey, reaffirmed its general definition of "reasonable cause" as follows:
We have held that reasonable cause for an investigatory detention is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. The right to make an investigatory stop and question the particular individual detained must be based upon reasonable cause to believe that he has been, is, or is about to be engaged in criminal conduct. [emphasis supplied]. 446 So.2d at 286.
The Court then found that the defendant's "seizure" in Ossey was constitutionally valid:
When the "seizure" occurred, there existed sufficient articulable facts to justify a Terry-type stop based on a reasonable belief that defendant was transporting drugs. The agents knew that defendant arrived from a source city for the transportation of drugs into New Orleans; he was visibly nervous, occasionally stopping to look over his shoulder; he claimed a relatively small piece of luggage compared to the length of his flight; he was traveling under an alias; and, he purchased a one way ticket with cash. Since these were adequate grounds for a reasonable belief that defendant was carrying drugs, the "seizure" was a permissible Terry-type investigatory detention. 446 So.2d at 286.
The foregoing analysis of reasonable suspicion in Ossey is critically important. The facts relied on by the Court in support of its finding that reasonable suspicion existed to detain the defendant are all factors from the drug courier profile. However, the Court did not specifically refer to the profile in its analysis. Rather, the analysis was conducted on the basis of all facts known by the officers when they "seized" the defendant. The Court, in Ossey, essentially used a "totality of the circumstances" standard to evaluate reasonable suspicion.
Shortly after Ossey, the Louisiana Supreme Court returned to the area of airport detentions in State v. Jackson, 457 So.2d 660 (La.1984). Based on the defendant's behavior fitting certain factors of the drug courier profile, officers placed the defendant under observation when he arrived in New Orleans on a flight from Los Angeles. The officers stopped the defendant as he left the airport building. After some brief questioning, the officers told the defendant that they thought he was carrying narcotics and they asked for his consent to search his suitcase. The defendant refused. The officers and the defendant then proceeded to an office in the airport to allow the officers to obtain a search warrant. Ultimately the defendant consented to the *1378 search, and narcotics were found in his suitcase. In reversing the action of the lower courts denying the defendant's motion to suppress, the Louisiana Supreme Court likened the case to Royer, supra. Justice Blanche, author of the Jackson opinion, pointed out that once the defendant refused to give his consent for a search of his suitcase, his relocation to a police office for further questioning exceeded the scope of a permissible investigatory stop. The defendant in Jackson, like the defendant in Royer, had as a practical matter been arrested. 457 So.2d at 663.
Since New Orleans International Airport is located within the jurisdiction of this circuit, it is not surprising that this court has ruled previously on airport detentions. In State v. Thomas, 482 So.2d 32 (La.App. 5 Cir.1986), we affirmed the conviction of a defendant charged with a narcotics violation, who arrived in New Orleans aboard a flight from Los Angeles. Two officers assigned to flight surveillance duties at the New Orleans Airport decided to observe the defendant because of his behavior on arrival. The defendant appeared nervous. He stopped and made a brief call from a public telephone. Then, he entered a restroom, from which he exited after a short time and went to the baggage claim area. During this entire period, the defendant kept looking around to see if he was under observation by anyone. After claiming a small piece of luggage, the defendant left the baggage claim area. One of the officers approached the defendant, identified himself as a policeman and asked if the defendant would mind answering a few questions. The defendant agreed. At the officer's request, the defendant produced his driver's license and airline ticket. These items were in different names. After learning that the defendant was traveling under an alias, the officers informed him that they were conducting a narcotics investigation and asked if they could search his baggage. The defendant agreed to the search. The search was ultimately conducted in a police office at the airport and illegal drugs were found. Based upon the Louisiana Supreme Court's decisions in Ossey, and Jackson, we concluded that the initial encounter with the defendant was a permissible investigatory stop and that the subsequent detentions and searches were consensual. Although not delineated as such, this court looked to the totality of the circumstances to determine if reasonable suspicion existed for the stop.
In State v. Wiley, 507 So.2d 841, 847 (La.App. 5 Cir.1987), this court, in affirming a drug related conviction arising out of an airport detention, reviewed all facts known by the officers at the time the defendant was stopped and held that the officers had sufficient factual support for their belief that the defendant was carrying narcotics at the time he was stopped; and the "seizure" was therefore permissible.
In State v. Geraci, 518 So.2d 554 (La. App. 5 Cir.1987), a confidential informant advised police officers that the defendant would be carrying heroin into New Orleans International Airport on a return flight from Texas. After investigating the accuracy of this tip and further learning that the defendant was a known drug trafficker, police officers waited for his arrival at which time he was placed under observation. As the defendant and a companion attempted to leave the airport, they were stopped by six plainclothes officers who requested that the couple accompany them to a police office at the airport. After reviewing the facts, this court concluded that the initial stop of the defendant was a permissible investigatory stop; which escalated into an arrest when the defendant was relocated to the police office by six officers who prevented him from leaving. We concluded that probable cause existed for an arrest of the defendant. Geraci does not address in great detail any issues involving reasonable suspicion. The focus of the case is on the existence of probable cause for an arrest.
A close analysis of the foregoing Fifth Circuit jurisprudence, particularly State v. Thomas, supra, and State v. Wiley, supra, reveals that this Court has applied the "totality of the circumstances" standard for determining the existence of reasonable suspicion in connection with investigatory stops consistent with the recent pronouncements *1379 of the U.S. Supreme Court in U.S. v. Sokolow, supra[5].
In the case under consideration, appellant Davis urges this Court to apply a two-part test for reasonable suspicion similar to the test rejected in U.S. v. Sokolow, supra.
In the instant case, the investigatory stop arises out of what has been labeled the "Drug Courier Profile". Our Courts have upheld certain stops pursuant to this label and has [sic] overruled other stops. However, our Courts have consistently required the establishment of reasonable and articulable suspicion that one was engaged in criminal activity. The mere fact that a defendant's behavior correlates with various elements of the drug courier profile does not in itself provide reasonable and articulable suspicion.
The appellant attempts to support his argument by comparing facts arguably present or absent in this case with the facts of previously decided cases involving airport detentions[6]. Each case must be considered under its own particular facts. Florida v. Royer, supra; State v. Ossey, supra; State v. Thomas, supra. That principle of particularized scrutiny on a case by case basis has now been reinforced by the U.S. Supreme Court in U.S. v. Sokolow, supra.
A review of the facts in the present case indicates that adequate grounds existed for an investigatory stop of the appellant. Mr. Davis arrived in New Orleans aboard a non-stop flight from Los Angeles, a known source city for drugs entering the area. He was one of the first passengers to deplane and his nervous demeanor attracted the attention of Detective Davis. As the appellant walked through the concourse, he kept looking all around to see if he was being watched or followed. When he reached the baggage claim area, Mr. Davis paced nervously until the flight baggage arrived. He kept looking to see if he was the subject of surveillance. After claiming his single piece of luggage, the appellant went to the airport cab stand, still acting nervously. When Detective Davis initially approached him at the cab, the appellant agreed to speak with the officer and further agreed to produce his airline ticket and driver's license. Detective Davis noticed that the appellant's hands were trembling by this time. The airline ticket was a one-way ticket purchased with cash. The appellant's speech became broken and his breathing became labored. At this point, Detective Davis specifically identified himself as a narcotics officer and asked the appellant if he was carrying any contraband or drugs.
The foregoing facts, considered under a "totality of the circumstances" standard, constitute sufficient grounds for the trial court's finding that reasonable suspicion justifying an investigatory stop of the appellant existed. As the trial court further pointed out, the facts articulated by Detective Davis must be considered in light of the officer's considerable law enforcement experience and specific training in flight surveillance. This is also consistent with the "totality of the circumstances" standard. U.S. v. Sokolow, supra.
Based upon a careful review of the record and applying the jurisprudence and law discussed above to the facts, we are of the strong opinion that ample grounds existed to justify the investigatory stop in this case.
This assignment of error lacks merit.
*1380 ASSIGNMENT OF ERROR NUMBER TWO
The trial court erred in denying the motion to suppress and finding that the cursory stop did not evolve into a Fourth Amendment "seizure".
The foundation necessary for asserting this assignment of error does not exist in the record of the case. Appellant contends that the trial court erroneously found that the encounter between Detective Davis and the appellant did not evolve into a Fourth Amendment "seizure". The record indicates that a Terry-type "seizure" did occur and that there was reasonable suspicion to justify it.
At the hearing on the motion to suppress, Detective Davis testified that after inspecting appellant's airline ticket and driver's license, he told the appellant that he was a narcotics detective and asked if the appellant was carrying any drugs or contraband. The appellant answered "no".
A person is "seized" for Fourth Amendment purposes only when, by means of physical force or a show of authority, his freedom of movement is restrained. U.S. v. Mendenhall, supra, 100 S.Ct. at 1877.
In State v. Ossey, supra, at 285, the Louisiana Supreme Court found that a defendant became the subject of a Fourth Amendment seizure when informed by a law enforcement officer that the officer was conducting a narcotics investigation and that the officer believed that the defendant was transporting drugs. The officer had previously identified himself as a narcotics agent and he was holding the defendant's airline ticket and driver's license. According to the court in Ossey, supra, these circumstances taken together amount to a show of official authority sufficient to constitute a Fourth Amendment seizure. 446 So.2d at 285.
In the instant case, Detective Davis was holding the appellant's airline ticket and driver's license when he advised the appellant that he was a narcotics detective. Although Detective Davis did not specifically tell the appellant that he was the target of a narcotics investigation, the officer did ask the appellant if he was carrying any drugs. This inquiry, at the very least, implied that the appellant was suspected of carrying illegal drugs. Considering these circumstances, appellant Davis became the subject of a Terry-type seizure when Detective Davis identified himself as a narcotics officer and asked if the appellant was transporting drugs. U.S. v. Mendenhall, supra; State v. Ossey, supra.
Appellant Davis argues that he was stopped while getting into a cab to leave the airport, and that Officer Davis could have approached and stopped him while he walked down the concourse, while he waited for his baggage in the claim area, as he retrieved his baggage before leaving the claim area and/or while he was standing outside of the claim area. In each of those instances the appellant was not leaving the airport. However, Detective Davis was observing the appellant at each of the places suggested above, attempting to confirm or dispel whether an investigatory stop of the appellant was justified. The record reflects that a Fourth Amendment "seizure" of appellant occurred while the appellant was attempting to board a taxicab. To now suggest, as appellant apparently does, that Mr. Davis could have been stopped before he reached the cab, thereby resulting in a less intrusive "seizure", would require the Court to engage in what the Sokolow, decision characterized as "unrealistic second guessing". ___ U.S. at ___, 109 S.Ct. at 1587, quoting U.S. v. Montoya de Hernandez, 473 U.S. 531 at 542, 105 S.Ct. 3304 at 3311, 87 L.Ed.2d 381 (1985).
This assignment of error also lacks merit.
ASSIGNMENT OF ERROR NUMBER THREE
The trial court erred in denying the motion to suppress and finding that the search was voluntary.
The appellant contends that he did not freely and voluntarily consent to the search of his suitcase. He argues that he felt compelled to allow the search and emphasizes in his brief that he was not told that he had the right to refuse the search request. *1381 The trial court, in denying the motion to suppress, found that the appellant voluntarily consented to the search.
The question whether appellant's consent to the search was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Ossey, 446 So.2d 280 (La.1984); State v. Wiley, 507 So.2d 841 (La.App. 5 Cir.1987).
The record in this matter clearly supports the trial judge's finding that appellant voluntarily consented to the search. When Detective Davis asked if appellant would allow a search of the suitcase, the appellant responded, "Sure, go ahead. I don't have anything inside of it." Without any further comment from Detective Davis, the appellant then said, "Wait, it's locked. Let me give you the key." Appellant reached into his pocket, retrieved the luggage key and handed it to Detective Davis.
At the hearing on the motion to suppress, Detective Davis testified that appellant freely consented to the search, and appellant Davis testified that he felt compelled to cooperate with Detective Davis. In finding that the search was voluntary, the trial judge apparently concluded that Detective Davis' testimony was more credible than the testimony of the appellant. Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case, and factual determinations of the trial judge are entitled to great weight on appellate review. State v. Edwards, 434 So.2d 395 (La.1983); State v. Ossey, supra; State v. Wiley, supra.
This assignment of error is without merit.
Additionally, we have reviewed the record for errors patent in accordance with guidelines in State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. McGee, 527 So.2d 486 (La.App. 5 Cir.1988), and have found none.
Accordingly, for the reasons assigned, we find no error in the learned trial judge's denial of the motion to suppress and the conviction and sentence of the defendant are affirmed.
AFFIRMED.
NOTES
[1] Detective Davis has been with the Jefferson Parish Sheriff's Office for twenty years. He was transferred to the narcotics section in February, 1987, after serving fourteen years with the vice squad. Since his transfer to the narcotics section, Detective Davis has been assigned flight surveillance duties at the New Orleans International Airport. He attended and completed a training course sponsored by the U.S. Drug Enforcement Agency to enhance his surveillance skills. The course, which dealt with procedures for interdicting commercially transported narcotics, focused on the characteristics constituting the now familiar "drug courier profile". In addition to this course study, Detective Davis obtained practical training and experience in the performance of his duties by working with other narcotics detectives.
[2] Agent Sam Brown did not approach the defendant with Detective Davis. Brown maintained a distance of several feet during the entire encounter between the detective and the defendant.
[3] The purpose of the stop involved in Brignoni-Ponce, supra, was to determine whether immigration laws were being violated.
[4] The court in Ossey, supra, specifically referred to the officers' experience with flight surveillance duty. 446 So.2d at 282. This would therefore appear to be a relevant factor in evaluating the existence of reasonable suspicion.
[5] Implicit in the Sokolow Court's announcement that the existence of reasonable suspicion shall be determined according to a "totality of the circumstances" standard is the corollary that such a determination is a question of fact to be resolved by the trial judge; and factual determinations of the trial judge are entitled to great weight on appellate review. State v. Edwards, 434 So.2d 395 (La.1983); State v. Thomas, supra.
[6] Appellant reviews the facts bearing on reasonable suspicion in State v. Wiley, supra; State v. Salazar, 389 So.2d 1295 (La.1980); State v. Geraci, supra; State v. Brown, supra; State v. Ossey, supra; State v. Thomas, supra and State v. Washington, supra. All of these cases have been analyzed above, except State v. Salazar, supra. That case applies the principles previously announced by the Louisiana Supreme Court in State v. Brown, supra. Accordingly, Salazar adds nothing further to the legal analysis contained herein.